# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Mauvais-Jarvis v. Wong*, 2013 IL App (1st) 120070

---

| | |
|---|---|
| Appellate Court Caption | FRANCK MAUVAIS-JARVIS, M.D., P.h.D., Plaintiff-Appellant, v. WINIFRED P. S. WONG, JOSEPH T. WALSH, LAURAN QUALKENBUSH, JON E. LEVINE, MICHELLE L. OESER, NORTHWESTERN UNIVERSITY, and JOHN AND JANE DOES Nos. 1 through 10, Defendants-Appellees. |
| District & No. | First District, Fourth Division<br>Docket Nos. 1-12-0070, 1-12-0237 cons. |
| Filed | March 28, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action for defamation and conspiracy to defame arising from allegations that defendants presented claims that plaintiff, a professor of medicine, submitted inaccurate data for publication in a scientific paper, the dismissal of plaintiff's defamation claims on the ground that defendants were protected by absolute privilege based on their duty to report research misconduct was reversed, since plaintiff's allegations that defendants acted recklessly and with malice were not denied by any pleadings and plaintiff would be allowed to proceed on that issue, but the dismissal of the conspiracy counts was upheld on the ground that they were barred by the one-year statute of limitations in section 13-201 of the Code of Civil Procedure. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-L-00614; the Hon Michael R. Panter, Judge, presiding. |

| | |
|---|---|
| Judgment | Affirmed in part and reversed in part; remanded for further proceedings. |
| | |
| Counsel on Appeal | Constantine John Gekas and John C. Gekas, both of Gekas Law LLP, of Chicago, for appellant. |
| | |
| | Eric S. Matson and Marah S. McLeod, both of Sidley Austin LLP, of Chicago, and Lisa A. Hausten, of Law Offices of Lisa A. Hausten, of Wheaton, for appellees. |
| | |
| Panel | JUSTICE FITZGERALD SMITH delivered the judgment of the court, with opinion. |
| | Presiding Justice Lavin and Justice Pucinski concurred in the judgment and opinion. |

**OPINION**

¶ 1    The plaintiff, Franck Mauvais-Jarvis (hereinafter Mauvais-Jarvis), filed a complaint in the circuit court alleging, *inter alia*, that the defendants, Winifred P. S. Wong (hereinafter Wong), Joseph T. Walsh (hereinafter Walsh), Lauran Qualkenbush (hereinafter Qualkenbush), Jon E. Levine (hereinafter Levine), Michelle L. Oeser (hereinafter Oeser), and Northwestern University (hereinafter Northwestern or the University), either defamed him or conspired to defame him by formally presenting to the Northwestern internal inquiry committee allegations that Mauvais-Jarvis submitted inaccurate data for publication in a scientific paper. The defendants filed motions to dismiss the complaint pursuant to sections 2-615 and 2-619 of the Illinois Code of Civil Procedure (Civil Procedure Code) (735 ILCS 5/2-615, 2-619 (West 2008)) and the circuit court granted their motions pursuant to section 2-619 (735 ILCS 5/2-619 (West 2008)).[1] The court dismissed the defamation counts, holding that since the defendants acted under a mandatory duty to report and investigate suspected research misconduct, their statements were protected by absolute privilege. The court also dismissed the conspiracy to defame counts, finding: (1) that since the statements at issue

---

[1]We note that in his complaint, Mauvais-Jarvis also alleged defamation and conspiracy to defame against other "unknown and unnamed defendants (#1-10)." The motions to dismiss did not refer to these defendants and the circuit court initially found that the case "remain[ed] pending against John and Jane Does #1-10." However, on January 19, 2012, the court entered an "Agreed Final Order" wherein the parties concurred that the circuit court's November 29, 2011, and December 21, 2011, orders, "disposed of all claims in the case even though the caption includes the defendants 'John and Jane Does #1-10'." The court then dismissed, with prejudice, all claims against such unknown defendants.

were protected by absolute privilege, the plaintiff had failed to allege any actionable conduct (*i.e.*, defamation) underlying the alleged conspiracy and (2) that, in any event, the conspiracy counts were time-barred pursuant to section 13-201 of the Civil Procedure Code (735 ILCS 5/13-201 (West 2008)). The plaintiff now appeals, contending that the circuit court improperly applied absolute privilege to the defendants' statements when no such privilege is recognized under Illinois law in the context of a university research misconduct proceeding. The plaintiff also argues that his civil conspiracy claim is not time-barred because the applicable statute of limitations is found in section 13-205 of the Civil Procedure Code (735 ILCS 5/13-205 (West 2008)), and not section 13-201 of that Code (735 ILCS 5/13-201 (West 2008)) and permits the filing of such claims within five years. For the reasons that follow, we affirm in part, and reverse and remand in part.

¶ 2                                    I. BACKGROUND

¶ 3    The record reveals the following undisputed facts and procedural history. Defendant Northwestern University is a specially chartered private Illinois corporation. As an institution that receives federal funding for biomedical and behavioral research it is governed by a complex set of federal regulations with respect to investigating research misconduct.

¶ 4                              A. The Federal Regulations

¶ 5    Pursuant to the Public Health and Welfare Act (42 U.S.C. § 289b (2008)) the Secretary of the United States Department of Health and Human Services (HHS) has established an agency, the Office of Research Integrity (ORI), within the Public Health Service (PHS),[2] responsible for investigating all reports of research misconduct from institutions receiving HHS funding. The Secretary has also promulgated regulations, entitled "Public Health Services Polices on Research Misconduct," requiring institutions that receive such financial assistance to establish proceedings[3] to investigate good-faith allegations of research misconduct and to report all such investigations to the ORI. See 42 U.S.C. § 289b (2008); see also 42 C.F.R. § 93 *et seq.* (2005).

¶ 6    Pursuant to these regulations, "[i]nstitutions and institutional members have an affirmative duty to protect PHS funds from misuse" and the "primary responsibility for responding to and reporting allegations of research misconduct." 42 C.F.R. § 93.100(b) (2005) "Research misconduct" is defined as:

"fabrication, falsification, or plagiarism in proposing, performing, or reviewing research, or in reporting research results.

---

[2]We note that PHS includes the National Institute of Health (NIH).

[3]The proceedings contemplated by these regulations are defined in the following manner:
"Research misconduct proceeding means any actions related to alleged research misconduct taken under this part, including but not limited to, allegation assessments, inquiries, investigations, ORI oversight reviews, hearings, and administrative appeals." 42 C.F.R. § 93.223 (2005).

(a) Fabrication is making up data or results and recording or reporting them.

(b) Falsification is manipulating research materials, equipment, or processes, or changing or omitting data or results such that the research is not accurately represented in the research record.

(c) Plagiarism is the appropriation of another person's ideas, processes, results, or words without giving appropriate credit.

(d) Research misconduct does not include honest error or differences of opinion." 42 C.F.R. § 93.103 (2005).

¶ 7 The regulations recognize that research misconduct proceedings are most often initiated by a complainant, *i.e.*, a person who brings forward allegations that a researcher has committed research misconduct. The regulations therefore require that the complainant make allegations in "good faith." See 42 C.F.R. § 93.203 (2005) ("Complainant means a person who in *good faith* makes an allegation of research misconduct." (Emphasis added.)). "Good faith" is defined as:

"having a belief in the truth of one's allegation or testimony that a reasonable person in the complainant's or witness's position could have based on the information known to the complainant or witness at the time. An allegation or cooperation with a research misconduct proceeding is not in good faith if made with knowing or reckless disregard for information that would negate the allegation or testimony." 42 C.F.R. § 93.210 (2005).

¶ 8 The regulations mandate that any institution receiving federal funding for research establish a two-tiered procedure for investigating allegations of research misconduct: (1) an inquiry and (2) an investigation. 42 C.F.R. §§ 93.212, 93.307 to 93.309, 93.215, 93.310 to 93.313 (2005).

¶ 9 The "inquiry," or the "preliminary information-gathering and preliminary fact-finding" stage (42 C.F.R. § 93.212 (2005)), is intended as "an initial review of the evidence" to determine whether an allegation warrants a further investigation, and therefore "does not require a full review of all the evidence related to the allegation." 42 C.F.R. § 93.307(c), (d) (2005). The person accused of research misconduct must be placed on notice of an inquiry. See 42 C.F.R. § 93.307(b) (2005) ("At the time of or before beginning an inquiry, an institution must make a good faith effort to notify in writing the presumed respondent, if any."). The institution must also timely complete the inquiry "within 60 calendar days of its initiation unless circumstances clearly warrant a longer period." 42 C.F.R. § 93.307(g) (2005). Once the inquiry is completed, the institution must prepare a written report of the inquiry committee's decision. 42 C.F.R. § 93.307(e) (2005). If the inquiry board determines that the allegations warrant an investigation, the institution must send the written report to the ORI. 42 C.F.R. § 93.309(a) (2005). If, however, the inquiry committee determines that it is not necessary to proceed with an investigation, it must merely retain its written report and all relevant evidence collected therein on file within the institution for the next seven years. 42 C.F.R. § 93.309(c) (2005).

¶ 10 The second, "investigation" stage of the proceedings is defined as:

"the formal development of a factual record and the examination of that record leading

to a decision not to make a finding of research misconduct or to make a recommendation for a finding of research misconduct which may include a recommendation for other appropriate actions, including administrative actions." 42 C.F.R. § 93.215 (2005).

During the investigation, the institution must interview witnesses and diligently pursue all leads. 42 C.F.R. §§ 93.310(g), (h) (2005). The investigation must be commenced "within 30 days after determining that an investigation is warranted" (42 C.F.R. § 93.310(a) (2005)), and the accused must be notified in writing of all allegations against him before the investigation begins. See 42 C.F.R. § 93.310(c) (2005) (The institution must "[n]otify the respondent in writing of the allegations within a reasonable amount of time after determining that an investigation is warranted, but before the investigation begins."). The final findings of the investigation committee must be memorialized in a written report (42 C.F.R. § 93.313 (2005)) and must be given to the accused for comment (42 C.F.R. § 93.312 (2005)). The final report must also be sent to the ORI. 42 C.F.R. § 93.315 (2005). The investigation itself must be completed "within 120 days of beginning it, including conducting the investigation, preparing the report of findings, providing the draft report for comment *** and sending the final report to ORI." 42 C.F.R. § 93.311(a) (2005). If the institution is unable to complete the investigation within 120 days, it must request, in writing, an extension of time from the ORI. 42 C.F.R. § 93.311(b) (2005).

¶ 11    After an institution completes its two-tiered investigatory procedure, the ORI may become involved by, *inter alia*, reviewing the institution's findings, making its own finding of research misconduct and proposing administrative actions to the HHS. 42 C.F.R. § 93.400 (2005). When the ORI does choose to get involved and makes its own finding of research misconduct, it must propose and obtain HHS approval for "administrative actions," and must notify the respondent of these actions in a formal charge letter. 42 C.F.R. §§ 93.404 to 93.405 (2005). The HHS may then impose "HHS administrative actions" including, *inter alia*: (1) clarification, correction or retraction of the research record; (2) letters of reprimand; (3) suspension or termination of a PHS grant; (4) restriction on specific activities or expenditures under an active PHS grant; (5) adverse personnel action if the respondent is a federal employee; and (6) suspension or debarment from future grant funding for the individual respondent. See 42 C.F.R. §§ 93.400(c)(2), 93.404, 93.407 (2005).

¶ 12    A respondent has an opportunity to contest the ORI research misconduct findings and the HHS administrative actions by requesting an "administrative hearing" before an administrative law judge (ALJ) affiliated with the HHS within 30 days of receiving an ORI charge letter. 42 C.F.R. §§ 93.500 to 93.501 (2005). The parties to the hearing are only the respondent and the ORI, and not the institution where the research misconduct proceedings were initiated. 42 C.F.R. § 93.505 (2005). During such an administrative hearing, the parties are permitted to, *inter alia*: (1) be represented by counsel; (2) conduct discovery; (3) present relevant evidence and cross-examine witnesses; (4) agree to a stipulation of facts; (5) file motions in writing; and (6) make oral arguments. 42 C.F.R. § 93.505 (2005). After the hearing, the ALJ issues a ruling in writing setting forth his proposed findings of fact and any conclusions of law. 42 C.F.R. § 93.523(a) (2005). The ALJ's decision constitutes a recommended decision to the Assistant Secretary for Health, who reviews the ALJ's recommendations and makes a final decision. 42 C.F.R. § 93.523(b) (2005). The Assistant

Secretary of Health's decision is the final HHS action, unless debarment or suspension is an administrative action recommended in the decision. 42 C.F.R. § 93.523(b) (2005). If a decision results in a recommendation for debarment or suspension, the Assistant Secretary of Health must serve a copy of that decision upon the HHS debarring official. 42 C.F.R. § 93.523(c) (2005). The debarring official then makes the final HHS decision on a debarment or suspension. 42 C.F.R. § 93.523(c) (2005).

¶ 13      Because the consequences of a research misconduct proceeding can be dire, the regulations impose conditions of strict confidentiality on allegations of research misconduct. As section 93.108 of the regulations states:

"Disclosure of the identity of respondents and complainants in research misconduct proceedings is limited, to the extent possible, to those who need to know, consistent with a thorough, competent, objective and fair research misconduct proceeding, and as allowed by law." 42 C.F.R. § 93.108(a) (2005).

Disclosure of records or other evidence from which research subjects might be identified is also limited to "those who have a need to know to carry out a research misconduct proceeding." 42 C.F.R. § 93.108(b) (2005).

¶ 14          B. Northwestern's Internal Research Misconduct Policy and Procedures

¶ 15      Pursuant to the aforementioned federal regulations, Northwestern has set up its own policy and procedures for reviewing allegations of research misconduct as well as its own office of research integrity (hereinafter Northwestern's ORI). Northwestern's ORI is intended as an "independent and objective" agent responsible for facilitating the inquiry and the investigation processes. This office is headed by the vice president of research (VPR) who appoints the associate vice president for research integrity (AVPRI) to oversee the activities of both the inquiry and investigation committees.

¶ 16      Northwestern's policy and procedures closely mirror the federal regulations in many aspects, including: (1) defining "research misconduct"; (2) requiring "good faith" and "confidentiality" from all parties involved, including the complainant and the respondent; (3) creating a two-tiered investigation process, including an inquiry and an investigation; and (4) defining the scope and time frame of the inquiry and investigation proceedings.

¶ 17      Northwestern's policy advises all of its employees that they "*should* report observed, suspected or apparent research misconduct in research to [their] department chair or dean, and through such consultation determine whether the matter should be pursued." (Emphasis added.) The policy also permits employees to report suspected research misconduct directly to the VPR or the AVPRI, or the provost of the University.

¶ 18      Northwestern's policy deviates from the federal regulations in other respects. For one, it permits the University provost to consult "in confidence" with the VPR, the AVPRI, and the director of Northwestern's ORI, as well as the deans and other relevant university personnel, in the initial and preliminary assessment of all allegations of research misconduct. According to the policy, the purpose of this initial assessment is to determine the appropriate roles and responsibilities of the university, its personnel and the oversight agencies with respect to evaluating the allegations, as well as to identify individuals, information and data

relevant to the allegations. During this consultation, the director of Northwestern's ORI determines whether the allegation meets the definition of "research misconduct" and warrants further action, *i.e.*, an inquiry followed by an investigation. According to Northwestern's policy, after an investigation committee makes it findings, the provost is authorized to determine and invoke appropriate sanctions or disciplinary actions within the university.

¶ 19                                C. The Parties

¶ 20    Plaintiff, Mauvais-Jarvis, is an associate professor of medicine at Northwestern University's Feinberg School of Medicine and the research director of Northwestern's Comprehensive Center on Obesity. He is a leading expert in endocrinology and diabetes research, having authored over 50 scientific articles and book chapters in this field. Mauvais-Jarvis is a member of the prestigious American Society for Clinical Investigation, and the recipient of numerous awards including, *inter alia*, the Pioneer Award from the Institute for Women's Health Research at Northwestern and the Innovative Research Grant from the American Heart Association. His current research centers on the effect of the female hormone, estrogen, in the protection from diabetes mellitus and obesity in humans. Mauvais-Jarvis champions the discovery of estrogen receptors' activation in protecting insulin-producing pancreatic β-cells in type 1 and type 2 diabetes.

¶ 21    As part of his research at Northwestern, Mauvais-Jarvis oversees a laboratory where he conducts research funded, in substantial part, by the NIH, a division of the HHS.

¶ 22    Defendant, Wong, worked in Mauvais-Jarvis' laboratory as a postdoctoral fellow between 2006 and May 2010. Defendant Oeser worked in Mauvais-Jarvis' laboratory as a research technician between 2006 and June 2008, when she left to pursue a doctorate in biology at the University of Washington. Defendant Levine is a professor emeritus at Northwestern. At the time of the events underlying this cause of action, he was a full-time professor of neurobiology and physiology at Northwestern. In 2010, he became the director of the Wisconsin National Primate Research Center at the University of Wisconsin in Madison. Defendant Walsh is Northwestern's VPR and defendant Qualkenbush is the director of Northwestern's ORI.

¶ 23                            D. The Undisputed Facts

¶ 24    Much of the factual background of this case is in dispute. We will therefore begin by setting forth the facts that the parties agree upon. The parties agree that in 2008, Mauvais-Jarvis and his laboratory personnel were involved in a research project involving the possibility of estrogen amplifying β-cell insulin synthesis via extranuclear signaling of the estrogen receptor α. This project was funded by an NIH grant. As a result of this research, in June 2008, Mauvais-Jarvis, Wong and Oeser submitted a manuscript for possible publication in the *Journal of Biological Chemistry*. Because of her doctoral degree and seniority, Wong was assigned as the "first author" on the draft manuscript. As a lab technician, Oeser was responsible for collecting and then mapping certain data that was included in two figures within the manuscript, figures 6C and 6H. Those two figures,

however, contained fabricated data. The parties disagree as to who is responsible for the fabrication of the data, with Oeser alleging that it is Mauvais-Jarvis and Mauvais-Jarvis contending that it is Oeser.

¶ 25      After leaving Mauvais-Jarvis' laboratory for graduate school, Oeser contacted defendant Levine to discuss the fabricated data. Oeser knew Levine because she had worked in his in laboratory as a researcher, while completing her undergraduate degree at Northwestern. Levine advised Oeser that the manuscript should be withdrawn. As a result, on June 23, 2008, Oeser informed Mauvais-Jarvis of the inaccuracy of the submitted data and asked that her name be removed from the manuscript. Mauvais-Jarvis directed Wong to run the actual experiments and collect the data. When the paper came back from the reviewers of the *Journal of Biological Chemistry*, the corrected figures and data were inserted in the paper and on July 8, 2008, with approval from Andrea Dunaif, Mauvais-Jarvis' division chief and direct supervisor, the manuscript was resubmitted for publication.

¶ 26      Soon thereafter, on July 22, 2008, upon recommendation from Larry Jameson, dean of Northwestern's Feinberg School of Medicine (and also coauthor of the manuscript), Mauvais-Jarvis withdrew the paper from review by the *Journal of Biological Chemistry* until the matter could be resolved within the university. Since then, significant changes have been made to the paper and in June 2010, it was published in another prestigious journal, the *Proceedings of the National Academy of Sciences*.

¶ 27      On July 30, 2008, Northwestern's ORI sent Mauvais-Jarvis a letter, notifying him that Oeser and Levine had accused him of research misconduct. Specifically, Mauvais-Jarvis was charged with "falsifying" figures 6C and 6H in the draft manuscript submitted to the *Journal of Biological Chemistry* in early June of that year. Soon thereafter, Northwestern officials convened an inquiry committee of faculty members to assess the allegations of research misconduct. The committee reviewed the allegations and interviewed various witnesses, including Wong. On May 5, 2009, the committee issued its final report unanimously concluding that the charges by Oeser and Levine were not credible and did not merit a full investigation.

¶ 28      Soon thereafter, it became apparent that other data, in figure 4F, of the manuscript submitted to the *Journal of Biological Chemistry* was inaccurate. The parties disagree as to who is responsible for this incorrect data, with Wong arguing that it is Mauvais-Jarvis and Mauvais-Jarvis pointing the finger at Wong. As a result, on December 17, 2010, as Northwestern's director of ORI, Qualkenbush issued a new charge letter against Mauvais-Jarvis, alleging that Mauvais-Jarvis had: (1) falsified figure 4F; (2) falsified figures 6C and 6H; and (3) instructed Wong to lie to the inquiry committee in February 2009 and tell them that Oeser was responsible for the falsified images in figures 6C and 6H. The charge letter also stated that in an attempt to coerce Wong into saying what he wanted her to say, Mauvais-Jarvis told her that "the lives of the five people in [his] lab depended on what she told the Committee." Qualkenbush sent copies of this letter to two administrative officials at the Feinberg School of Medicine (the dean for research and the chair of the department of medicine). A second inquiry committee was then convened. On June 2, 2011, that committee concluded that sufficient evidence was presented to warrant a full investigation into all of the charges against Mauvais-Jarvis. Walsh, Northwestern's VPR, then sent a letter to Mauvais-

Jarvis listing all those allegations. Qualkenbush forwarded copies of this letter to the interim dean and the vice dean of the Feinberg School of Medicine. On June 13, 2011, Mauvais-Jarvis filed this lawsuit.

¶ 29                                    E. The Complaint

¶ 30        In his five-count complaint, Mauvais-Jarvis alleges: (1) defamation *per se* against Wong, Walsh, Qualkenbush and Northwestern (counts I and III); (2) defamation *per quod* against Wong, Walsh, Qualkenbush and Northwestern (count II and IV); and (3) civil conspiracy against Oeser, Wong and Levine (count V).

¶ 31                              1. Defamation Claim Against Wong

¶ 32        With respect to Wong, Mauvais-Jarvis first alleges that statements she made in an email exchange with Qualkenbush on July 22, 2010, were defamatory *per se* and *per quod*. In that email exchange, Qualkenbush initially wrote to Wong:

"Hello Winnie [Wong],

Thank you for taking the time to talk this afternoon. I'm sending the revised language for the allegations for your review and approval.

DRAFT allegation language:

You instructed Winifred Wong to lie on your behalf in preparation for her interview with the Inquiry Committee in February 2009. Specifically, you instructed Ms. Wong to inform the Committee that Michelle Oeser was responsible for the falsified images in the manuscript. In addition, in an attempt to coerce her into saying what you wanted, you told Ms. Wong that the lives of the five people in your lab depended on what she told the Committee.

Please let me know if the above statement is correct, or if not, please let me know what is incorrect.

Thank you again for your assistance.

Lauran [Qualkenbush]"

In response, that same day, Wong emailed Qualkenbush the following:

"Hi Lauran [Qualkenbush],

Yes, the statement below is correct.

Winnie [Wong]."[4]

¶ 33        Mauvais-Jarvis alleges that the statement in Wong's email was false and that Wong made it with "ill will and malice" and in retaliation because Mauvais-Jarvis terminated her

---

[4]We note that this email exchange was not attached as an exhibit, but that instead the plaintiff included it in the body of his complaint. The parties, however, appear to agree that this email exchange occurred; they do not dispute the sufficiency of the plaintiff's complaint on the basis of his failure to attach the email exchange as an exhibit.

employment in April 2010. In the complaint, Mauvais-Jarvis alleges that beginning in February 2009, he began documenting Wong's substandard performance in the laboratory, including, *inter alia*: permitting important animal protocols to expire; giving improper presentations at weekly lab meetings; failing to follow instructions regarding breeding procedures and then lying about her animal breeding strategy; sloppily editing manuscripts; making serious mistakes in plotting data; giving samples from Mauvais-Jarvis' laboratory to another laboratory without his authorization and in violation of the applicable institutional rules; mixing up different genes; and leaving work early in the middle of important experiments.

¶ 34    Mauvais-Jarvis also documented Wong's "inexcusable mistakes" with respect to the manuscript that was submitted to the *Journal of Biological Chemistry*. Specifically, according to the complaint, in early 2009, Wong came to Mauvais-Jarvis informing him that Joe Tiano, a Ph.D. student in his laboratory, had discovered that there was a problem with figure 4F, which had been included in the manuscript submitted to the *Journal of Biological Chemistry* in 2008, but which had since been withdrawn. At a brief meeting, with Tiano and Wong, Mauvais-Jarvis discussed the problem–an inversion of some data from one or two columns to others. Both Tiano and Wong told Mauvais-Jarvis they did not know how the inversion had occurred. According to the complaint, since Tiano was responsible for the experiments and the recording of the data, and Wong, as first author, was responsible for reviewing the data and putting it into proper final form, Mauvais-Jarvis immediately suspected that Wong had made "some kind of careless error." Mauvais-Jarvis therefore instructed Wong to fix the problem and "make absolutely sure that the data and figure 4F were corrected right away." Several months later, on October 14, 2009, Mauvais-Jarvis, who was reviewing the manuscript, wrote the following email to Wong:

> "I am working on your paper. So far looks good. As we discussed you need to verify with Joe whether the experiment of E2 induction of RIP-luc is in its correct format (I don't remember but some condition was inverted?) And especially if we need another confirmation because it is one of the critical experiments of the paper. It is the mechanism with the NeruoD1 data. Thanks."

On November 24, 2009, Mauvais-Jarvis was reviewing the paper again and realized that the old erroneous figure was still in the network subdirectory that should have contained only the final version. He, therefore, emailed Wong stating: "[T]his figure should have been finalized a month ago and you told me that it was done. It is your responsibility as the first author to finalize all figures. Please update this figure *today*." (Emphasis in original.) Wong emailed back that the old file was still in the location for final files, so Mauvais-Jarvis responded with the following instruction: "All final files should be final to avoid mistakes. Withdraw the old figure and put it in an old file."

¶ 35    According to the complaint, as a result of these serious inadequacies, in April 2010, Mauvais-Jarvis fired Wong. The complaint alleges that before leaving the laboratory, Wong came into Mauvais-Jarvis' office, angrily confronted him about her termination, and "threatened to destroy his career." Soon thereafter, she changed her story regarding Oeser's "inadequate performance" with respect to figures 6C and 6H, and spoke to Qualkenbush accusing Mauvais-Jarvis of falsifying data in figures 6C, 6H and 4F.

¶ 36                    2. Defamation Claim Against Walsh and Qualkenbush

¶ 37    With respect to Walsh and Qualkenbush, Mauvais-Jarvis alleges that they made several *per se* and *per quod* defamatory statements against him in retaliation because he sought redress directly from the University's provost to end the "unwarranted research misconduct proceedings against him," accusing Northwestern's ORI of violating both federal regulations and its own policies.

¶ 38    According to the complaint, on June 14, 2010, Mauvais-Jarvis sent a letter to the provost seeking his direct "intervention" in the matter. Mauvais-Jarvis wrote to the provost that he was accused of research misconduct by a former lab technician (Oeser), who had failed to perform essential duties related to a research project, and then concealed this mistake from him. The letter to the provost stated that the lab technician had acted "at the urging of a research competitor at the University" (Levine), and that Mauvais-Jarvis was exonerated from any charges after a full scale inquiry. The letter also accused Northwestern's ORI of committing at least four documented violations of his rights and the applicable HHS regulations during that inquiry (including, *inter alia*, failing to notify him of the beginning of the inquiry proceedings on time and failing to complete the inquiry proceedings as quickly as mandated by the federal regulations). In addition, the letter accused Walsh of ignoring the committee's recommendations, stating:

> "Subsequently, the matter was reviewed by Vice President Walsh who ignored the Committee recommendations and raised a new, baseless and trivial charge that the Inquiry Committee had rejected and which did not constitute research misconduct in any event. Through the University's Office of General Counsel that new charge matured into a threat of a formal investigation unless I agreed to admit wrongdoing as to that new baseless charge that I did not commit. When I proposed a compromise on the matter and requested that Dr. Walsh close the investigation, Dr. Walsh and the University's lawyer went silent for months, leaving this matter hanging over my head, as it is today."

The letter further accused the University's counsel of refusing Mauvais-Jarvis' request to be reimbursed for his legal expenses pursuant to the University's indemnification policy.[5]

¶ 39    According to the complaint, on the same day that he contacted the University provost, and as a direct result of his plea to the provost, defendant Walsh retaliated by sending him the following letter:

> "You were contacted by the [ORI] because new allegations of research misconduct have been raised against you. Specifically that:
>
> 1. you falsified figure 4F in a draft manuscript *** which was submitted for publication to the *Journal of Biological Chemistry* in 2008; and
>
> 2. You instructed Winifred Wong to lie on your behalf in preparation for her interview

---

[5]On April 22, 2011, over the University's objection, the circuit court granted Mauvais-Jarvis' motion requiring the University to advance/indemnify his legal expenses and attorney fees. On May 15, 2011, the circuit court entered a preliminary injunction ordering the University to do so.

with the Inquiry Committee in February 2009."

¶ 40 The complaint alleges that Walsh's letter set in motion a series of further investigations against Mauvais-Jarvis. Specifically, on December 17, 2010, Qualkenbush issued a second charge letter against Mauvais-Jarvis, alleging that he: (1) falsified figure 4F; (2) falsified figures 6C and 6H; and (3) instructed Wong to lie to the inquiry committee in February 2009. According to the complaint, this charge letter is defamatory *per se* and *per quod*, because it is false and because, for no apparent reason and "in violation of both the federal regulations and Northwestern's ORI policies and procedures," it was sent to Rex Chisholm, the dean for research at the Feinberg School of Medicine, and Douglas E. Vaughn, the chair of the department of medicine.

¶ 41 The complaint also alleged that after the second inquiry committee reported its findings to Walsh, determining that the charges against Mauvais-Jarvis warranted a full investigation, Walsh sent a letter containing those charges to Mauvais-Jarvis. For "no sufficient reason" and "in violation of both the federal regulations and Northwestern's ORI policies and procedures," Qualkenbush then forwarded that letter to Chisholm and Jeffrey Glassroth, the interim dean of the Feinberg School of Medicine.

### 3. Defamation Claim Against Northwestern

¶ 43 With respect to Northwestern's responsibility for the aforementioned defamatory statements, the complaint alleges that at all relevant times, Oeser, Wong, Walsh and Qualkenbush "committed the acts and omissions alleged in the complaint as employees and agents of the university and acting in the scope of that employment and agency." Therefore, under the doctrine of *respondeat superior*, Northwestern was responsible for their actions.

### 4. Civil Conspiracy Claim Against Wong, Oeser and Levine

¶ 45 Finally, with respect to the civil conspiracy count, the complaint alleges that, acting in "secret agreement," Oeser, Wong and Levine engaged in a conspiracy to destroy Mauvais-Jarvis' professional career by making false and defamatory accusations against him in 2008. According to the complaint, Oeser failed to conduct the experiments in figures 6C and 6H, but in order to make it appear that she had completed them, she used templates developed within Mauvais-Jarvis' laboratory as part of is routine practice and then inserted made-up data into those templates. The complaint alleges that Wong was aware of Oeser's negligence, because Oeser contacted her about it after she left the laboratory. Neither Oeser nor Wong approached Mauvais-Jarvis about the falsified data or took any steps to correct it. Instead, according to the complaint, Oeser contacted Mauvais-Jarvis' leading competitor in the field, Levine, to tell him what had occurred. The complaint alleges that Oeser and Levine then conspired to shift the blame onto Mauvais-Jarvis and accuse him of research misconduct. The complaint further alleges that in doing so, they communicated with Wong.

¶ 46 The complaint further alleges that both Oeser and Levine were motivated by ill-will and malice toward Mauvais-Jarvis. According to the complaint, unknown to Mauvais-Jarvis, Oeser "harbored deep resentment" against him because he had reprimanded her for taking too much leave, which had interfered with her completion of important experiments, and

because she incorrectly believed that he did not intend to give her a recommendation for graduate school.[6] Similarly, the complaint alleges that, at least since 2006, Mauvais-Jarvis' research directly competed with Levine's, particularly in obtaining federal grant money. As a result, Levine routinely attempted to interfere with Mauvais-Jarvis' experiments and to prevent his publications.

¶ 47    In support of these allegations, Mauvais-Jarvis attached: (1) his *curriculum vitae* and (2) a transcript of Wong's testimony before Northwestern's first inquiry committee, which exonerated him of all charges of research misconduct. That transcript reveals that during the hearing before the inquiry committee, Wong testified that it was standard practice in the laboratory to use templates. She testified that the day before the manuscript was supposed to be submitted to the *Journal of Biological Chemistry*, Oeser mentioned to her in passing that she did not believe that the data in figures 6C and 6H was real. Wong testified that Oeser was responsible for authenticating the data in those figures and that she did not know why Oeser did not authenticate the data or speak with Mauvais-Jarvis about it if she did not believe it to be accurate. As Wong told the committee:

> "[I]f it really bothered her all that much, why didn't she go to my boss and sort it out there and then–before it was submitted. But, obviously, it bothered her a lot because she knowingly worked on incorrect data, right, because she actually put in the legends, she put in the A, B, C's and she put in the scale bars and everything, so she knowingly knew that the data was inaccurate, so she was responsible for the authenticity of the data, and if she had a problem with it, a lot of problems obviously, then she should actually have spoken to the boss about it. So I'm not sure what went on, I don't understand why she didn't do that."

¶ 48    Wong also testified that after Oeser left the laboratory for graduate school, she telephoned Wong and told her that she had spoken to Levine and that Levine had advised her to ask Wong to confront Mauvais-Jarvis about the falsified data. Wong, however, did not feel comfortable doing this, because she herself had not compiled the data, and because Oeser had not confronted Mauvais-Jarvis while she was still working at the laboratory.

¶ 49    Wong explained that although she trusted that Oeser was a good lab technician, Oeser "may have had some interpersonal problems with Mauvais-Jarvis." Wong told the inquiry committee that in January 2008 she saw Oeser crying in the women's bathroom. When Wong confronted her, Oeser told her that Mauvais-Jarvis said that if she did not complete certain experiments by a certain time he would not give her a reference letter for graduate school. Oeser then asked Wong to act as a proxy referee, and Wong drafted a reference letter and sent it to the University of Washington on Oeser's behalf.

¶ 50    Wong also testified that Mauvais-Jarvis is a very focused and demanding individual who requires hard work and discipline from his employees and sets deadlines for himself and for everyone else in the lab. Wong admitted that she often "felt pressure" while working in his laboratory. With respect to the 2008 manuscript submission, Wong testified that Mauvais-

---

[6]According to the complaint, Mauvais-Jarvis, had written "a glowing letter of recommendation" for Oeser's acceptance to the University of Washington.

Jarvis wanted the experiments and the draft completed by a certain date because a competing laboratory in Spain was doing similar research and intending to submit a similar publication.

¶ 51                                    F. The Defendants' Motions to Dismiss

¶ 52    On August 31, 2011, the defendants filed two combined section 2-619.1 motions to dismiss (735 ILCS 5/2-619.1 (West 2008)). In these motions, they argued that Mauvais-Jarvis' defamation claims were barred by absolute privilege and by the Illinois Citizen Participation Act (735 ILCS 110/1 *et seq.* (West 2008)). Defendants Oeser, Wong and Levine also argued that the civil conspiracy claims against them were barred by the one-year statute of limitations in section 13-201 of the Civil Procedure Code (735 ILCS 13-201 (West 2008)). They pointed out that the underlying tortious acts, *i.e.*, the alleged defamatory statements by Oeser and Levine in fabricating the research misconduct allegations against Mauvais-Jarvis, were made in 2008, more than three years before the lawsuit was filed. In addition, Wong argued that the conspiracy count against her should be dismissed pursuant to section 2-615 of the Civil Procedure Code (735 ILCS 5/2-615 (West 2008)) because Mauvais-Jarvis had insufficiently pleaded her knowledge and voluntary agreement to be part of any alleged conspiracy.

¶ 53    In support of their motions to dismiss, the defendants attached copies of: (1) Northwestern ORI's policy and procedures for reviewing alleged research misconduct; (2) the HHS and the ORI sample policy and procedures for responding to allegations of research misconduct; and (3) an affidavit from Oeser averring that an email she sent to Levine on June 22, 2008, was accurate. A copy of that email was attached to Oeser, Wong and Levine's motion to dismiss and states in full:

> "Jon,
>
> I spoke to Winnie [Wong] once more and we've decided on the following series of actions to get us to the desired endpoint (retraction of the paper) most quickly.
>
> First, I'd like to send you an email with an attachment detailing how the immunocytochemistry images in question were put together. That way, you have it available when you contact Dr. Dunaif.
>
> Next, I'll send an email to Franck [Mauvais-Jarvis], cc-ing both you and Winnie [Wong], stating the following:
>
> a. I am uncomfortable with the current misrepresentation of my images on the current submission of the paper.
>
> b. I would like my name removed from the publication until the experiments in question have been done and the actual data are included in the paper.
>
> c. I have spoken to you and that you have advised me that retraction of the paper is the correct action to take at this point.
>
> Winnie [Wong] and I feel that this approach (cc-ing both of you) will give Franck [Mauvais-Jarvis] the least amount of time to change his story or shift blame. At this point we think it would be good for you to inform Dr. Dunaif (if you see fit), so that Franck has absolutely no choice but to call the paper back.

Once he retracts the paper, Winnie [Wong] will ensure that all necessary experiments are completed and all data are scrutinized before resubmitting.

Both the email with the attachment (to you only) and the email to Franck [Mauvais-Jarvis] (cc-ing you and Winnie [Wong]) will probably be sent from my Northwestern email address; as far as I know it is still functional.

What do you think about this? Please let me know as soon as you can.

Thanks for all of your help in this,

Michelle [Oeser]."

¶ 54    On October 11, 2013, Mauvais-Jarvis filed his response to the motions to dismiss. He argued that the defendants' defamatory statements were not protected by the Illinois Citizen Participation Act (735 ILCS 110/1 *et seq.* (West 2008)) nor entitled to absolute privilege. At best, Mauvais-Jarvis argued, the statements could be protected by qualified privilege. With respect to the conspiracy claim, Mauvais-Jarvis argued that it was governed by the five-year statute of limitations in section 13-205 of the Civil Procedure Code (735 ILCS 5/13-205 (West 2008)) and not the one-year statute of limitations in section 13-201 of that Code (735 ILCS 5/13-201 (West 2008)). He further argued that he sufficiently pleaded Wong's agreement and participation in the conspiracy by pointing out that the aforementioned emails between Oeser and Levine in 2008 reveal that despite Wong's knowledge of Oeser's mistake in falsifying the data in figures 6C and 6H, instead of speaking with Mauvais-Jarvis, she communicated with Oeser and Levine and agreed on a course of action to accuse Mauvais-Jarvis of falsifying the data. In addition, in support of his arguments, Mauvais-Jarvis attached copies of: (1) federal regulations regarding research misconduct (42 C.F.R. pt. 93 *et seq.* (2005)); (2) Northwestern ORI's policies and procedures for reviewing alleged research misconduct; and (3) two documents establishing that Northwestern is a private university (an April 22, 2011, sworn certificati2on of Northwestern University Deputy General Counsel Stephanie M. Graham, and Northwestern's 1851 charter by the Illinois legislature).[7]

¶ 55                          D. The Circuit Court's Ruling

¶ 56    In response to the motions to dismiss, the circuit court issued two separate orders. In its first order, the court denied the defendants' motions to dismiss on the basis of the Illinois Citizen Participation Act (735 ILCS 110/1 *et seq.* (West 2008)). In light of the Illinois Supreme Court's recent decision in *Sandholm v. Kuecker*, 2012 IL 111443, limiting the scope of that Act, the defendants have not challenged this ruling on appeal.

¶ 57    In its second order, the circuit court held that the defendants enjoyed absolute privilege under Illinois common law. The court explained:

"Federal regulations promulgated by the U.S. Department of [HHS] create an affirmative duty for health institutions and their members to report allegations of research misconduct in order to protect public health service funds from misuse by ensuring the integrity of all federally funded work. [Citation.] *** There is no dispute that

_____

[7]On appeal, the parties do not dispute that Northwestern is a private entity.

-15-

Northwestern is required to comply with these regulations."

¶ 58    The court held that Oeser, Wong and Levine were protected by absolute privilege because under the Northwestern policy for reporting research misconduct, as employees of the university they "had an affirmative duty to report allegations of research misconduct to Northwestern." The court similarly held that Walsh and Qualkenbush were protected by absolute privilege on the basis of their obligations as Northwestern officials responsible for investigating research misconduct. As the court explained:

"As employees directly responsible for preserving the research integrity of the institution, they were required to provide their superiors with written notice of the determination that an inquiry was needed to investigate charges of research misconduct against Mauvais-Jarvis. Therefore, they had an affirmative duty through their employment relationship and under federal law to republish the charges."

The court also concluded that since the claims against Northwestern were derivative of the claims against Walsh and Qualkenbush, they too had to be dismissed.

¶ 59    In coming to this decision, the court rejected Mauvais-Jarvis' argument that the privilege applicable to this situation is only qualified and limited to statements and allegations of misconduct made in "good faith." As the court noted:

"There is no basis to find defendants went to the [ORI] with a desire to cause Mauvais-Jarvis harm. There is no allegation they deviated from established protocol in reporting their allegations. There is no allegation they told anyone else at Northwestern other than the people to whom they were obligated to report. Oeser, Levine and Wong put themselves under review by reporting suspected research misconduct. They put their work at issue before the [ORI] and potentially involved themselves. Their actions may have negative consequences for them. *** There are no allegations and no showing that they acted in bad faith and no basis to find that they should be deprived of the protection afforded by privilege."

¶ 60    The court also found that the one-year statute of limitations for defamation claims pursuant to section 13-201 (735 ILCS 5/13-201 (West 2008)) had expired with respect to any statements made by Oeser and Levine in 2008. Accordingly, the court dismissed the "defamation charges" against Oeser and Levine.[8]

¶ 61    With respect to the civil conspiracy claims against Oeser, Wong and Levine, the court found that since the claims were predicated on the commission of the underlying tort, *i.e.*, the publishing of defamatory statements against Mauvais-Jarvis, which were absolutely privileged, there could be no conspiracy. In addition, the court found that the conspiracy claim against Wong was flawed because it lacked the necessary element of agreement.

¶ 62    The plaintiff now appeals contending that the circuit court erred in dismissing his

---

[8]We note that Mauvais-Jarvis did not raise a claim of defamation against Oeser and Levine, but rather a claim of conspiracy to defame, based on statements made by them in 2008. Accordingly, the circuit court misspoke when it dismissed the charges of "defamation" against these two defendants.

complaint pursuant to section 2-619.1 of the Code of Civil Procedure (735 ILCS 2-619.1 (West 2008)).

¶ 63                                    II. ANALYSIS

¶ 64        Section 2-619.1 of the Code of Civil Procedure allows a party to file a motion combining a section 2-615 motion to dismiss with a section 2-619 motion to dismiss. 735 ILCS 5/2-619.1 (West 2008). A section 2-615 motion to dismiss attacks the legal sufficiency of a complaint by asserting that it fails to state a cause of action upon which relief can be granted. *Oliveira v. Amoco Oil Co.*, 201 Ill. 2d 134, 147 (2002); see also 735 ILCS 5/2-615 (West 2008). A section 2-619 motion to dismiss, on the other hand, admits the sufficiency of the complaint, but asserts an affirmative matter that acts to defeat the claim. *Patrick Engineering, Inc. v. City of Naperville*, 2012 IL 113148, ¶ 31; *King v. First Capital Financial Services Corp.*, 215 Ill. 2d 1, 11-12 (2005); *Wallace v. Smyth*, 203 Ill. 2d 441, 447 (2002); see 735 ILCS 5/2-619(a)(9) (West 2008) (allowing dismissal when "the claim asserted against defendant is barred by other affirmative matter avoiding the legal effect of or defeating the claim"). When ruling on either motion to dismiss, a reviewing court must construe the pleadings and supporting documents in the light most favorable to the nonmoving party and accept as true all well-pleaded facts in the complaint and all inferences that may reasonably be drawn in the plaintiff's favor. *Sandholm v. Kuecker*, 2012 IL 111443, ¶ 55. Under either section, our review is *de novo*. *Solaia Technology, LLC v. Specialty Publishing Co.*, 221 Ill. 2d 558, 579 (2006).

¶ 65                                    A. Defamation

¶ 66        In the present case, the circuit court dismissed Mauvais-Jarvis' defamation claims against Wong, Qualkenbush, Walsh and Northwestern pursuant to section 2-619(a)(9) of the Civil Procedure Code (735 ILCS 5/2-619(a)(9) (West 2008)), finding that they were barred by absolute privilege.

¶ 67        To establish defamation, a plaintiff must present facts showing that the defendant made a defamatory statement about the plaintiff, the defendant made an unprivileged publication of that statement to a third party, and the publication caused damages. *Solaia Technology*, 221 Ill. 2d at 579. "A defamatory statement is a statement that harms a person's reputation to the extent it lowers the person in the eyes of the community or deters the community from associating with her or him." *Solaia*, 221 Ill. 2d at 579.

¶ 68        There are two types of defamatory statements: defamation *per se* and defamation *per quod*. *Brennan v. Kadner*, 351 Ill. App. 3d 963, 968 (2004). In an action for defamation *per quod*, the plaintiff must plead and prove actual damages in order to recover. *Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc.*, 227 Ill. 2d 381, 390 (2008). If a defamatory statement is actionable *per se*, however, the plaintiff need not plead or prove actual damage to his or her reputation to recover. *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 87 (1996). "Rather, statements that fall within *** actionable *per se* categories are thought to be so obviously and materially harmful to [the plaintiff] that injury to [the plaintiff's] reputation may be presumed." *Bryson*, 174 Ill. 2d at 87.

¶ 69    The Illinois Supreme Court recognizes only five categories of statements that are defamatory *per se*: (1) words that impute a person has committed a crime; (2) words that impute a person is infected with a loathsome communicable disease; (3) words that impute a person is unable to perform or lacks integrity in performing his or her employment duties; (4) words that impute a person lacks ability or otherwise prejudices that person in his or her profession; and (5) words that impute a person has engaged in adultery or fornication. See *Solaia*, 221 Ill. 2d at 579-80.

¶ 70    Even statements that are defamatory *per se*, however, are not actionable if they are protected by privilege. *Anderson v. Beach*, 386 Ill. App. 3d 246, 249 (2008) (citing *Zych v. Tucker*, 363 Ill. App. 3d 831, 834 (2006)). "As a matter of public policy, certain types of defamatory statements are deemed privileged so that the person making the statement will not be deterred from speaking by the threat of civil liability." *Starnes v. International Harvester Co.*, 141 Ill. App. 3d 652, 653 (1986). There are two types of privilege available: absolute and qualified privilege. *Starnes*, 141 Ill. App. 3d at 653-54.

¶ 71    Where absolute privilege is granted, no cause of action for defamation lies against the person making the statement even if it is made with malice. *Starnes*, 141 Ill. App. 3d at 653-54; see also *Zych v. Tucker*, 363 Ill. App. 3d 831, 834 (2006) ("An absolute privilege provides a complete immunity from civil action even though the statements were made with malice because public policy favors the free and unhindered flow of such information."); see also William L. Prosser, Torts § 114, at 777 (4th ed. 1971) (Absolute immunity is extended to communications "where there is an obvious policy in favor of permitting complete freedom of expression, without any inquiry as to the defendant's motives.").

¶ 72    On the other hand, where only qualified privilege is granted the person making the statement is immune from liability unless some element such as malice is present. *Starnes*, 141 Ill. App. 3d at 653-54; see also *Zych*, 363 Ill. App. 3d at 834; see also Prosser, *supra*, at 785-86 ("There remain a group of situations in which the interest which the defendant is seeking to vindicate is regarded as having an intermediate degree of importance, so that the immunity conferred is not absolute, but is conditioned upon publication in a reasonable manner and for a proper purpose. The privilege is therefore spoken of as 'qualified,' 'conditional' or 'defeasible'. *** [With qualified privilege] the publication is privileged when it is 'fairly made by a person in the discharge of some public or private duty, whether legal or moral, or in the conduct of his own affairs, in matters where his interest is concerned.' " (quoting *Toogood v. Spyring*, 149 Eng. Rep. 1044 (1834))). A qualified privilege exists when the following elements are present: " '(1) good faith by the defendant in making the statement; (2) an interest or duty to uphold; (3) a statement limited in its scope to that purpose; (4) a proper occasion; and (5) publication in a proper manner and to proper parties only.' " *Zych*, 363 Ill. App. 3d at 834 (quoting *Kuwik v. Starmark Star Marketing & Administration, Inc.*, 156 Ill. 2d 16, 25 (1993)). The protection provided by a qualified privilege is lost if: "(1) false statements are made with malice or a reckless disregard for their truth, (2) the statements are not limited in scope, or (3) publication is not limited to proper parties." *Zych*, 363 Ill. App. 3d at 835 (citing *Kuwik*, 156 Ill. 2d at 27). The question of whether privilege is absolute or qualified is a matter of law to be decided by the court. *Anderson*, 386 Ill. App. 3d at 249 (citing *Zych*, 363 Ill. App. 3d at 834).

¶ 73    On appeal, Mauvais-Jarvis contends that only qualified privilege can apply to allegedly defamatory statements made in the context of a university research misconduct proceeding. The defendants, on the other hand, contend that the circuit court properly extended absolute privilege to such statements. The parties concede, and our research has revealed, that no Illinois case has specifically addressed this issue. Accordingly, we are faced with a case of first impression in Illinois. For the reasons that follow, we are compelled to find that only qualified privilege applies.

¶ 74    The class of occasions where defamatory statements are absolutely privileged in Illinois is very narrow and has generally been limited to legislative, judicial and some quasi-judicial proceedings and "other acts of State," including "communications made in the discharge of a duty under express authority of law." *Busch v. Bates*, 323 Ill. App. 3d 823, 833 (2001); see also *Zych*, 363 Ill. App. 3d at 834 ("The class of occasions where defamatory statements are absolutely privileged is narrow and generally limited to legislative, judicial and some quasi-judicial proceedings."); see also *Parillo, Weiss & Moss v. Cashion*, 181 Ill. App. 3d 920, 928 (1989); see also *Weber v. Cueto*, 209 Ill. App. 3d 936, 942 (1991) ("The class of absolutely privileged communications is narrow and is practically limited to legislative and judicial proceedings and other acts of State, including communications made in the discharge of a duty under express authority of law."); *Anderson v. Beach*, 386 Ill. App. 3d 246, 249 (2008) ("Absolutely privileged communications are rare."); *Thomas v. Petrulis*, 125 Ill. App. 3d 415, 418 (1984) ("The class of occasions where libelous words are absolutely privileged is narrow."); Prosser, *supra*, at 777 ("Absolute immunity has been confined to *a very few situations* where there is an obvious policy in favor of permitting complete freedom of expression, without any inquiry as to the defendant's motives." (Emphasis added.)). The Restatement (Second) of Torts § 592A (1977) provides that "[o]ne who is required by law to publish defamatory matter is absolutely privileged to publish it." The comment to section 592A states that the rule provided therein "will apply whenever the one who publishes the defamatory matter acts under legal compulsion in so doing." Restatement (Second) of Torts § 592A, cmt. b, at 258 (1977).

¶ 75    The defendants first argue that because they were required to report and investigate research misconduct under the federal regulations and Northwestern's ORI policies they should be protected by absolute privilege. We disagree.

¶ 76    Although the defendants are correct in asserting that the federal regulations impose an "affirmative duty" on all "institutions and institutional members" receiving federal funding for medical and scientific research to protect government "funds from misuse" by "responding to and reporting allegations of research misconduct" (42 C.F.R. § 93.100(b) (2005)), that duty is explicitly qualified by the requirement of "good faith" both in reporting and investigating research misconduct. See 42 C.F.R. § 93.203 (2005) ("Complainant means a person who in *good faith* makes an allegation of research misconduct." (Emphasis added.)); see also 42 C.F.R. § 93.210 (2005) ("Good faith as applied to a complainant or witness means having a belief in the truth of one's allegation or testimony that a reasonable person in the complainant's or witness's position could have based on the information known to the complainant or witness at the time. An allegation or cooperation with a research misconduct proceeding is not in good faith if made with knowing or reckless disregard for information

-19-

that would negate the allegation or testimony. Good faith as applied to a committee member means cooperating with the research misconduct proceeding by carrying out the duties assigned impartially for the purpose of helping an institution meet its responsibilities under this part. A committee member does not act in good faith if his/her acts or omissions on the committee are dishonest or influenced by personal, professional or financial conflicts of interest with those involved in the research misconduct proceeding.").

¶ 77 Consistent with the federal regulations, Northwestern's ORI policy conditions reporting of research misconduct on "good faith." A complainant, who is defined as "an individual who submits an allegation of research misconduct," is "responsible for making allegations in *good faith*." (Emphasis added.) "Good faith" allegations are defined as:

> "allegation[s] made with the honest belief that research misconduct may have occurred. An allegation is not in good faith if it is made in reckless disregard for or willful ignorance of facts that would disprove the allegation."

In addition, in delineating the responsibility to report research misconduct, the policy provides that Northwestern will protect "those individuals who provide information in *good faith* about questionable conduct against reprisals." The policy further provides that just as it aims to protect complainants against retaliation, Northwestern is "equally concerned about malicious or frivolous allegations made against our research community" and therefore "performs a careful assessment of all allegations brought to the attention of institutional officials."

¶ 78 Taking into account the "good faith" language of the federal regulations, which was adopted by Northwestern's ORI policy, we believe that only qualified privilege protection is contemplated for statements made in the context of a university research misconduct proceeding. See *Lee v. John Deere Insurance Co.*, 208 Ill. 2d 38, 43 (2003) (the plain language of a statute or regulation is the best indicator of its intended meaning).

¶ 79 We find direct support for this conclusion in a 1993 position paper of the ORI, the federal agency directly responsible for enforcing the aforementioned regulations.[9] That position paper, titled, "The Whistleblower's Conditional Privilege to Report Allegations of Scientific Misconduct" specifically states:

---

[9]We note that neither party has cited this position paper in their briefs. When questioned about the paper during oral arguments, counsel for Mauvais-Jarvis stated that he "thought the paper had been removed or withdrawn." Counsel, however, did not cite any authority, nor point this court to any evidence whatsoever to support this position. Counsel for the defendants, on the other hand, remained silent, offering no argument or citation to authority to either support or negate the reliability of the opinion paper. Since the paper remains on ORI's website and our research has revealed nothing that would suggest that it has been withdrawn or removed, we will treat it as persuasive authority. See *Pickett v. Sheridan Health Care Center*, 664 F.3d 632, 648 (7th Cir. 2011) (holding that a court may take judicial notice of government websites, as long as the parties are given an opportunity to be heard on the issue). In either event, our decision does not rest on the presence or absence of the ORI position paper; rather, for the reasons further discussed in our opinion, regardless of that position paper, we conclude that absolute privilege does not apply to statements made in the context of a private university's research misconduct proceedings.

"Consistent with PHS regulations, ORI believes that whistleblowers possess a conditional [or qualified] privilege to disclose, in good faith to the proper institutional or ORI officials, allegations of scientific misconduct. Such a conditional privilege would protect whistleblowers from defamation claims even where the allegations ultimately prove to be untrue. However, whistleblowers who abuse the privilege by making bad faith allegations or by intentionally violating the confidentiality of accused parties may not be protected from defamation claims."[10]

There can be no clearer statement of an agency's intent than this. See *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984) (holding that if a statute or regulation is silent or ambiguous with respect to specific issue, a reviewing court should defer to an agency's interpretation of that regulation or statute, so long as the interpretation is reasonable); *Cotter & Co. v. Property Tax Appeal Board*, 277 Ill. App. 3d 538, 542-43 (1995) (a reviewing court should overturn an agency's interpretation of its own regulation only if the interpretation is " 'clearly erroneous.' " (quoting *LaBelle v. State Employees Retirement System of Illinois*, 265 Ill. App. 3d 733, 735-36 (1994))).

¶ 80    Our conclusion is further supported by decisions of other jurisdictions, which have specifically addressed the applicability of privilege to defamation claims raised in the context of research misconduct proceedings, and have consistently and exclusively applied qualified privilege. See, *e.g.*, *Arroyo v. Rosen*, 648 A.2d 1074 (Md. Ct. Spec. App. 1994) (rejecting a university research associate's request to extend absolute privilege to statements he made about the department chairman's alleged fabrication of data in a published scientific paper to the investigatory committees of the university and later the Veterans' Administration (which had funded the chairman's position); holding that only qualified privilege applied to statements made in the context of a university research misconduct proceeding); see also *Chao v. Mount Sinai Hospital*, No. 10-CV 2869(HB), 2010 WL 5222118 (S.D.N.Y Dec. 17, 2010) (refusing to consider whether absolute privilege attached to statements made by a postdoctoral student accusing her employer and assistant professor of medicine of misrepresenting data on a manuscript about to be submitted for publication because the statements were subject to qualified privilege and qualified privilege provided grounds for dismissal), *aff'd*, 476 Fed. Appx. 982 (2d Cir. 2012) (finding that the lower court properly applied qualified privilege to statements made during the course of an investigation and disciplinary proceedings related to allegations of research misconduct in the context of a former professor's action against the medical school and faculty members for defamation); *Chandok v. Klessig*, 632 F.3d 803 (2d Cir. 2011) (applying only qualified privilege to statements made by director of a medical laboratory about postdoctoral fellow's alleged scientific research misconduct).[11] We agree with these decisions and are disinclined to

---

[10]See http://ori.hhs.gov/images/ddblock/whistleblower_conditional.pdf .

[11]We note that, aside from Mauvais-Jarvis' citation to *Chandok*, 632 F.3d 803, and the defendants' brief response to it, neither party cites to or addresses any of the aforementioned cases. Instead, the defendants cite to decisions from other jurisdictions which have applied absolute privilege to statements alleging poor teacher performance in the educational setting. See *Weissman*

broaden the scope of absolute privilege immunity to include statements made in the context of a private university's research misconduct proceedings.

¶ 81     The defendants nevertheless cite to *Weber*, 209 Ill. App. 3d at 942-48, *Busch*, 323 Ill. App. 3d at 832-34, *Anderson*, 386 Ill. App. 3d at 247-50, and *Goldberg v. Brooks*, 409 Ill. App. 3d 106, 112-13 (2011), for the proposition that statements made during the research misconduct proceedings must be protected by absolute privilege because they were made pursuant to an "affirmative duty to report." We have reviewed those cases, however, and find them inapposite.

¶ 82     In both *Weber* and *Busch*, the court extended absolute privilege to statements made "in the discharge of a duty under express authority of law." *Weber*, 209 Ill. App. 3d at 942, *Busch*, 323 Ill. App. 3d at 833. In *Weber*, absolute privilege was extended to a letter sent by an attorney to the chief judge of the circuit court and then published to the county board alleging improper use of funds by the State's Attorney because the attorney was under an absolute duty to report such violations pursuant to the disciplinary rules of the Code of Professional Responsibility. *Weber*, 209 Ill. App. 3d at 942-48. In *Busch*, the court applied absolute privilege to statements made by four police officers against a crime scene technician, alleging that the technician had acted outside the scope of his employment when he threatened a suspect in a homicide investigation, because the statements were made during an internal police disciplinary investigation and the officers were legally obligated to report such behavior pursuant to a State Police directive. See *Busch*, 323 Ill. App. 3d at 833-34.

¶ 83     In extending absolute privilege to these situations, both the *Weber* and *Busch* courts noted that their "greatest concern was 'the *mandatory* nature of the [defendant's] duty to report.' " (Emphasis added.) *Busch*, 323 Ill. App. 3d at 834 (quoting *Weber*, 209 Ill. App. 3d at 946). In *Weber* the court noted that "[i]f a lawyer fail[ed] to comply with [the rules requiring disclosure of another attorney's violation of the Code of Professional Conduct], he or she fac[ed] professional discipline." *Weber*, 209 Ill. App. 3d at 946. Similarly, in *Busch*, the court noted that pursuant to the relevant State Police directive " '[f]ailure [by the police officers] to cooperate with a properly conducted internal investigation [could] result in

---

*v. Mogol*, 462 N.Y.S.2d 383 (N.Y. Sup. Ct. 1983) (applying absolute privilege to parents' complaints to the board of education alleging poor performance by a junior high school teacher); see also *Martin v. Kearney*, 124 Cal. Rptr. 281 (Cal. Ct. App. 1975)) (applying absolute privilege to letters from parents complaining about public school teacher's performance to her supervisor). We find no analogy between evaluations of a teacher's performance and allegations of research misconduct. What is more, contrary to the defendants' assertions, our supreme court has specifically held, albeit tangentially, that statements made within a university setting about a professor's poor performance are to be protected only by qualified, and not absolute, privilege. See *Colson v. Stieg*, 89 Ill. 2d 205, 209 (1982) (holding that statements made by a university department chairman about a former assistant professor to a university personnel committee, that he had information that reflected adversely on the professor's performance as a teacher, were protected only by qualified privilege; noting "[t]he circumstances surrounding the making of the statements in question are not such as to require the protection of an absolute privilege, but instead, come within the accepted areas to which a qualified privilege has been extended").

discipline and even separation from the department.' " *Busch*, 323 Ill. App. 3d at 834 (quoting Illinois State Police Directive PER-30, 92-52, ¶ V(c)).

¶ 84    Unlike in *Weber*, and *Busch*, in the present case, the defendants would not have incurred any negative consequences as a result of their failure to report or investigate the alleged research misconduct. Although the federal regulations impose an "affirmative duty" upon institutional members to report and investigate misconduct (42 C.F.R. § 93.100 (2005)), and Northwestern's ORI policy states that all employees "should report" such misconduct, nothing in either the federal regulations or Northwestern's ORI policy compels an individual's disclosure. The federal regulations, themselves, extend only as far as the institutions receiving the federal funds, by conditioning the receipt of those funds upon the creation and implementation of policies and procedures to report and investigate misconduct. The federal regulations, however, do not have any reach over individuals. By their explicit language they do not purport to have enforcement power over an individual's choice to report scientific misconduct. Northwestern, similarly, has no reach over its employees. Although it advises all of its employees that they "should" report research misconduct, it provides Northwestern's ORI with no authority to either compel or enforce individual reporting or to punish those who fail to report. Accordingly, the duty to report here is not mandatory. *Cf. South 51 Development Corp. v. Vega*, 335 Ill. App. 3d 542, 560-61 (2002) ("No universal formula exists for differentiating between mandatory and directive statutory provisions. [Citation.] While use of the word 'shall' ordinarily denotes a mandatory obligation [citation], the term may take on a permissive or directive meaning depending on the legislature's intent. [Citations.] Generally if a statute imposes duties and by express terms provides that the omission to perform the duties renders the proceeding void, then courts are bound to construe those provisions as mandatory. Where, however, the statute provides that certain acts are to be done in a particular time and a particular manner and does not declare their performance to be essential to the validity of a proceeding, then the statute is directory. [Citations.]").

¶ 85    Therefore, a report of research misconduct is not an act done "in the discharge of a duty under express authority of law" (see *Weber*, 209 Ill. App. 3d at 942; *Busch*, 323 Ill. App. 3d at 833), but rather one carried out in furtherance of a moral obligation, which, we find, is more suitable for qualified privilege protection. See Prosser, *supra*, at 785 (noting that qualified privilege requires that the protected statements be made by a person in "the discharge of some *public or private duty whether legal or moral*" (emphasis added) (internal quotation marks omitted)); *Zych*, 363 Ill. App. 3d at 834 (holding that qualified privilege requires: " '(1) good faith by the defendant in making the statement; (2) *an interest or duty to uphold*; (3) a statement limited in its scope to that purpose; (4) a proper occasion; and (5) publication in a proper manner and to proper parties only' " (emphasis added) (quoting *Kuwik*, 156 Ill. 2d at 25)).

¶ 86    We similarly find the defendants' reliance on *Anderson*, 386 Ill. App. 3d at 247-50, misplaced. Contrary to the defendants' position, the central issue in *Anderson* was not the applicability of absolute privilege. See *Anderson*, 386 Ill. App. 3d at 247-50. Rather, in that case, the parties agreed that absolute privilege applied to a female police officer's letter to her superintendent accusing a male officer of misconduct and sexual harassment because she was under a duty to report misconduct. *Anderson*, 386 Ill. App. 3d at 249-50. The parties

-23-

disagreed, however, as to whether absolute privilege also applied to the officer's later dissemination of that letter to her peers. *Anderson*, 386 Ill. App. 3d at 250. The court in *Anderson* declined to extend absolute privilege to that situation, noting that the officer "was not acting within the scope of her official duties or authority when she revealed the letter and its contents to officers outside her chain of command." *Anderson*, 386 Ill. App. 3d at 250.

¶ 87    We also reject the defendants' reliance on *Goldberg*, 409 Ill. App. 3d at 112-13. In that case, the court extended absolute privilege to statements made by a teaching assistant to a public school principal that the school bus driver drove her against her will to three different locations before starting the bus route, and the principal's later statements to the school bus driver's employer that the bus driver was not a suitable person to work with children because he had harassed the teaching assistant and had threatened to run over two children crossing slowly in front of his bus. *Goldberg*, 409 Ill. App. 3d at 112-13. In extending the privilege to both statements, the court found that in reporting the misconduct, both the principal and the teacher had "acted within the scope of their public employment." *Goldberg*, 409 Ill. App. 3d at 112. Since the present case does not involve public employees acting within the scope of their duties, but rather a private university, *Goldberg* is not analogous.

¶ 88    For these same reasons, we reject the defendant's reliance on *Hartman v. Keri*, 883 N.E.2d 774 (Ind. 2008). In *Hartman*, the Indiana Supreme Court extended absolute privilege to complaints of sexual harassment by two Purdue University students against their professor pursuant to the university's antiharassment policy and through the university's affirmative action office. *Hartman*, 883 N.E.2d at 777-79. *Hartman*, however, is inapplicable since it involved a public university and not a private institution, like Northwestern. See *Hartman*, 883 N.E.2d at 775. *Hartman* is also factually distinguishable because Purdue's antiharassment policy, which details the university's process for reporting and investigating allegations of sexual harassment, significantly differs from Northwestern's research misconduct proceedings. That policy explicitly provides that a student who makes false allegations of sexual harassment is "subject to academic discipline for abuse of the process." *Hartman*, 883 N.E.2d at 778. In extending absolute privilege to allegations of sexual harassment in the university context, the Indiana Supreme Court relied on this precise provision of Purdue's antiharassment policy, noting that "[i]n practical terms [it] is a substantial deterrent to false reporting." *Hartman*, 883 N.E.2d at 778. As already explained above, there is no equivalent punishment for a researcher who falsely reports scientific misconduct, either under Northwestern's ORI policy or the federal regulations, so as to make the research misconduct proceedings analogous to Purdue's process for investigating sexual harassment claims. Accordingly, we find the defendants' citation to *Hartman*, unpersuasive.[12]

¶ 89    The defendants nevertheless argue that we should extend absolute privilege to statements made in the context of a university's research misconduct proceeding because such a

___

[12]This same reasoning applies to our refusal to be persuaded by the decision of the Maryland supreme court in *Reichardt v. Flynn*, 823 A.2d 566, 567 (Md. 2003), which similarly extended absolute privilege to allegations of sexual harassment made by public high school students against their coach.

-24-

proceeding is quasi-judicial in nature, or in the very least, "necessarily preliminary" to a quasi-judicial proceeding. For the reasons that follow, we disagree.

¶ 90     We acknowledge that in Illinois, absolute privilege protects statements made during legislative, judicial and some quasi-judicial proceedings, as well as actions and statements that are "necessarily preliminary" to such proceedings. *Zych*, 363 Ill. App. 3d at 835.

¶ 91     However, the defendants do not cite, nor has our research revealed, any Illinois case that has found a quasi-judicial proceeding or a "necessarily preliminary" step toward one in a proceeding before a private entity (which the parties concede Northwestern is) rather than one involving a governmental agency or another type of state actor. See *Weber v. Cueto*, 209 Ill. App. 3d 936, 942 (1991) ("The class of absolutely privileged communications is narrow and is practically limited to legislative and judicial proceedings *and other acts of State*, including communications made in the discharge of a duty under express authority of law." (Emphasis added.)); see also *Richardson v. Dunbar*, 95 Ill. App. 3d 254, 257 (1981) ("The [absolute] privilege adhering to testimony given in quasi-judicial proceedings encompasses testimony given *before administrative agencies or other governmental bodies* when such agencies or bodies are performing a judicial function. [Citations.]" (Emphasis added.)); see also, *e.g.*, *Allen v. Ali*, 105 Ill. App. 3d 887 (1982) (applying absolute privilege to statements made before the Illinois Attorney Registration and Disciplinary Commission (ARDC) since it acted as a quasi-judicial body); see also *Kalish v. Illinois Education Ass'n*, 157 Ill. App. 3d 969 (1987) (applying absolute privilege to a letter to the Illinois Supreme Court's Character and Fitness Committee for admission to the Illinois Bar because it acted in a quasi-judicial capacity); *Parker v. Kirkland*, 298 Ill. App. 340 (1939) (applying absolute privilege to statements made before the Board of Appeals of Cook County, since the board acted in a quasi-judicial capacity); *Kimball v. Ryan*, 283 Ill. App. 456 (1936) (applying absolute privilege to communications before the Chicago Board of Election Commissioners because it is a quasi-judicial body); *Krumin v. Bruknes*, 255 Ill. App. 503 (1930) (applying absolute privilege to statements made to the Naturalization Bureau of the United States Department of Labor since it performs quasi-judicial functions); *Thomas*, 125 Ill. App. 3d 415 (applying absolute privilege to a charge of sexual discrimination filed with the Equal Employment Opportunity Commission (EEOC) because the EEOC is a quasi-judicial body); *Starnes*, 141 Ill. App. 3d 652 (applying absolute privilege to a letter attacking the integrity of a circuit court judge sent to the Illinois Judicial Inquiry Board (JIB) since it acted in a quasi-judicial capacity); *Adco Services, Inc. v. Bullard*, 256 Ill. App. 3d 655 (1993) (applying absolute privilege to letters to the Central Midwest Interstate Low-Level Radioactive Waste Commission and Illinois Department of Nuclear Safety as they are quasi-judicial bodies); *Parrillo, Weiss & Moss*, 181 Ill. App. 3d 920 (applying absolute privilege to a letter to the Illinois Department of Insurance since the letter was a preliminary step to a quasi-judicial proceeding); but see *Allen v. Ali*, 105 Ill. App. 3d 887 (rejecting plaintiff's request to extend absolute privilege to letters written to the Chicago Bar Association and American Bar Association because the two *private organizations* did not perform quasi-judicial functions).

¶ 92     Even if a private entity could be considered a quasi-judicial body, which we certainly do not concede, in the present case, Northwestern's ORI does not possess the requisite powers necessary to act as such a body. In Illinois courts have identified six powers that differentiate

a quasi-judicial body from one performing merely an administrative function. See *Starnes*, 141 Ill. App. 3d at 655. These are: (1) the power to exercise judgment and discretion; (2) the power to hear and determine or ascertain facts and decide; (3) the power to make binding orders and judgements; (4) the power to affect personal or property rights of private persons; (5) the power to examine witnesses, to compel witness attendance and to hear the litigation of issues on a hearing; and (6) the power to enforce decisions or impose penalties. See *Starnes*, 141 Ill. App. 3d at 655. A quasi-judicial body need not possess all six powers; however, the more powers it possesses the more likely it is acting in a quasi-judicial manner. See *Starnes*, 141 Ill. App. 3d at 655.

¶ 93    Although Northwestern's ORI has the power to exercise judgment and determine facts in investigating research misconduct through the inquiry and investigation committees, it is not authorized to compel witness attendance during those proceedings. Nor does Northwestern's ORI posses the power to make binding orders and judgments that affect the personal or property rights of those found to have committed research misconduct. While it is true that upon a finding of research misconduct, the provost may "determine and invoke appropriate sanctions or disciplinary actions," those sanctions may be imposed only "within [the confines of] the university." For these reasons, we cannot find that Northwestern's ORI possesses the requisite powers of a quasi-judicial body. See *Starnes*, 141 Ill. App. 3d at 655.

¶ 94    Nor can we hold that the proceedings before Northwestern's ORI are a step "necessarily preliminary" to a quasi-judicial proceeding, particularly since the federal ORI must, of its own accord, choose to become involved by making its own finding of research misconduct, filing a formal charge letter and proposing and obtaining HHS approval for "administrative actions" against the respondent (42 C.F.R. §§ 93.400, 93.404 to 93.405, 93.500 to 93.501 (2005)).[13] See *Zych*, 363 Ill. App. 3d at 836 (holding that only qualified, rather than absolute, privilege applied to a defamatory letter that an arrestee sent to the office of internal affairs (OIA) of the sheriff's department, accusing the arresting officer of using excessive force; finding that a complaint to the OIA was not necessarily preliminary to a proceeding before the sheriff's merit board, which was authorized by statute to suspend a member of the police force, because the OIA was not charged with the duty to file charges against an officer with the merit board and because "[n]othing in the record support[ed] the conclusion that [it] ha[d] any power other than to investigate complaints against a member of [the police] and make recommendations to the sheriff who, in turn, [was authorized to] determine whether to suspend a member *** or file written charges with the Board").

¶ 95    In that respect, we are mindful that the ORI, the federal agency directly responsible for creating and implementing the regulations concerning the reporting and investigation of research misconduct, explicitly recognizes that institutional research misconduct proceedings generally do not rise to the level of judicial or quasi-judicial proceedings. See Office of

---

[13]In that respect, we also note that the federal regulations explicitly state that the parties to any "administrative hearing" initiated by a respondent seeking to challenge an ORI finding of research misconduct or any HHS administrative action are only the respondent and the ORI and not the institution where the research misconduct proceedings were initiated. See 42 C.F.R. § 93.505 (2005).

Research Integrity, Position Paper #1, The Whistleblower's Conditional Privilege to Report Allegations of Scientific Misconduct (Dec. 1993), http://ori.hhs.gov/images/ddblock/whistleblower_conditional.pdf ("An absolute privilege applies only in legislative and judicial proceedings. Allegations of scientific misconduct usually occur in a pre-adjudicatory context, and thus do not trigger an absolute privilege. Nevertheless, the whistleblower may claim a *conditional* privilege." (Emphasis in original.)).

¶ 96 In addition, we note that those jurisdictions that have explicitly addressed the applicability of absolute privilege to university research misconduct proceedings have refused to define such proceedings as quasi-judicial, noting that they lack the requisite procedural safeguards to protect those accused of research misconduct. See, *e.g.*, *Arroyo*, 648 A.2d at 1077-78 (holding that statements that a university research associate made about the department chairman's alleged fabrication of data in a published scientific paper to the investigatory committee of the university were not absolutely privileged for purposes of the chairman's defamation action against the associate; holding that the proceedings lacked the requisite safeguards to qualify as judicial or quasi-judicial, since, *inter alia*, the complaint commencing the proceedings was not made under oath, the proceedings were not public, the witnesses were not under oath or subject to cross-examination, and discovery was not available).

¶ 97 In the present case, Northwestern's ORI procedures, formulated on the basis of the federal regulations, establish only minimal due process protection for individuals accused of research misconduct, both during the inquiry and investigation stages. Although the procedures require that the respondent be placed on notice of the charges and the results of each step in the process, as well as given an opportunity to comment, they do not grant the respondent the right to subpoena witnesses or otherwise gather evidence, or the opportunity to confront or cross-examine their accusers. See 42 C.F.R. §§ 93.310 to 93.313 (2005). Rather, those kinds of safeguards become available only after the federal ORI decides to get involved by making its own finding of research misconduct, filing a formal charge letter against the respondent, and proposing and obtaining HHS approval for "administrative actions" against the respondent. See 42 C.F.R. §§ 93.400, 93.404 to 93.405 (2005); see also 42 C.F.R. §§ 93.500, 93.501, 93.505 (2005) (a respondent can contest the ORI's finding of research misconduct and the HHS administrative actions by requesting an "administrative hearing" before an ALJ; the parties at that hearing will be the respondent and the ORI; during such an administrative hearing, the parties are permitted to: (1) be represented by counsel; (2) conduct discovery; (3) present relevant evidence and cross-examine witnesses; (4) agree to a stipulation of facts (5) file motions in writing and (6) make oral arguments). For all of these reasons, we are disinclined to define Northwestern's internal research misconduct proceedings as quasi-judicial or preliminary to a quasi-judicial proceeding.

¶ 98 The defendants nevertheless contend that public policy necessitates the extension of absolute privilege to statements made about research misconduct because society has a vital interest in the soundness of scientific research and because the "need for protection is greater in the educational setting where the subject of the complaint–the educator–is in a position of authority over the student, so fear of retaliation presents a potential obstacle to open airing of grievances." We disagree.

¶ 99	As already articulated above, Northwestern's ORI policy, modeled after the federal regulations, recognizes the need for and strikes a balance between protecting complainants and whistleblowers, by enforcing strict rules of confidentiality and maintaining the integrity and reputation of its scholars by requiring "good faith" in reporting misconduct. The policy provides sufficient protection to whistleblowers by broadly encouraging reports of any "observed, suspected or apparent research misconduct," and by specifically providing that Northwestern will afford protection against reprisals to any individual who "provide[s] information in good faith about questionable conduct." On the other hand, the policy states that Northwestern is "equally concerned about malicious or frivolous allegation made against [its] research community" and therefore "performs a careful assessment of all allegations brought to the attention of institutional officials." Accordingly, contrary to the defendants' assertions, absolute privilege is not necessary in the context of a private university research misconduct proceeding. In fact, the extension of such privilege to protect those statements not made in good faith would only hinder investigation into and prevention of scientific misconduct, since it would burden the university's ORI with investigations into baseless complaints by disgruntled or malicious parties. Public policy is therefore better served by the rule of qualified privilege, since it encourages open communications on matters of research misconduct while not shielding the use of such communications for an individual's malicious purposes. See Prosser, *supra*, at 777 ("Absolute immunity has been confined to a very few situations where there is an obvious policy in favor of permitting complete freedom of expression, without any inquiry as to the defendant's motives.").

¶ 100	Accordingly, for all of the aforementioned reasons, we reject the defendants' invitation to extend absolute privilege to statements made in the context of a university's research misconduct proceedings. Instead, we find that such statements can only be protected by qualified privilege. See *Arroyo v. Rosen*, 648 A.2d 1074; see also *Chao*, 2010 WL 5222118, *aff'd*, 476 Fed. Appx. 982; *Chandok*, 632 F.3d 803.

¶ 101	We now apply this holding to the facts of this case to determine whether the allegedly defamatory statements made by the defendants during the research misconduct proceedings are in fact protected by qualified privilege so as to justify the dismissal of Mauvais-Jarvis' claims. The parties agree that there are only three allegedly defamatory *per se* statements at issue: (1) Wong's July 22, 2010, statement in an email to Qualkenbush confirming that Mauvais-Jarvis told her that the lives of five people in his laboratory depended on what she told the first inquiry committee and that he instructed her to lie to the committee that Oeser was responsible for the falsified images in figures 6C and 6H of the manuscript; (2) Qualkenbush's second charge letter against Mauvais-Jarvis, accusing him of making up data in figure 4F and instructing Wong to lie to the initial inquiry committee regarding figures 6C and 6H, which was "published" on December 17, 2010, to two senior medical school administrators; and (3) Walsh's June 3, 2011, letter to Mauvais-Jarvis containing those same allegations, written after the second inquiry committee concluded that the allegations warranted a full investigation, which Qualkenbush "published" by forwarding it to two senior administrators in the medical school.

¶ 102	We note, with some surprise, that the defendants do not argue in the alternative, nor did they before the circuit court, that if we reject their invitation to extend absolute privilege to

-28-

the allegedly defamatory statements, they should nonetheless be protected by qualified privilege. Nor do they offer any argument whatsoever as to why the three allegedly defamatory statements are in fact protected by qualified privilege so as to permit us to affirm the judgment of the circuit court on that ground. It is well settled that "issues not raised in the trial court are deemed forfeited and may not be raised for the first time on appeal." *Martinez v. River Park Place, LLC*, 2012 IL App (1st) 111478, ¶ 29; *People v. Phillips*, 215 Ill. 2d 554, 565 (2005).

¶ 103    Although it is axiomatic that we review the judgment of the lower court, and not its reasoning and therefore may uphold the court's judgment on any grounds called for by the record (*Lane v. Kalcheim*, 394 Ill. App. 3d 324, 331 (2009)), in reviewing a motion to dismiss we must, nevertheless, accept all the well-pleaded allegations and reasonable inferences therefrom in the light most favorable to the nonmoving party–here, Mauvais-Jarvis. See *Sandholm v. Kuecker*, 2012 IL 111443, ¶ 55. Since the record before us contains no answer to the complaint or any other pleadings by the defendants denying Mauvais-Jarvis' detailed allegations of recklessness and malice by Wong, Walsh and Qualkenbush in making the aforementioned statements, we have no basis upon which to determine that they were in fact protected by qualified privilege. See, *e.g.*, *People v. Universal Public Transportation, Inc.*, 2012 IL App (1st) 073303-B, ¶ 50 (a reviewing court "is not a repository" into which a party "may foist the burden of argument and research" (internal quotation marks omitted)); *People v. Universal Public Transportation, Inc.*, 2012 IL App (1st) 073303-B, ¶ 50 (nor is it the function or obligation of this court to act as an advocate or search the record for error). In that respect, we disagree with the circuit court's assessment that "there is no basis to find defendants went to [Northwestern's ORI] with a desire to cause Mauvais-Jarvis harm," or that there were "no allegations and knowing that they acted in bad faith." Mauvais-Jarvis' complaint sets forth detailed allegations of "ill-will" and "malice" by all three defendants to the defamation count. Specifically, the complaint alleges: (1) that Wong acted in retaliation for being terminated; and (2) that Walsh and Qualkenbush acted in reprisal after Mauvais-Jarvis sought redress with the University provost and accused Northwestern's ORI of violating his rights both under Northwestern's ORI policies and the federal regulations. Under this record, we are compelled to reverse the circuit court's dismissal of Mauvais-Jarvis' defamation claims and permit the case to proceed with discovery on that issue.


¶ 104                                B. Civil Conspiracy

¶ 105    We next address whether the circuit court properly dismissed Mauvais-Jarvis' civil conspiracy counts against Wong, Oeser, and Levine on the basis of it being time-barred. The parties agree that the conspiracy to defame claim against these three defendants is based upon statements they made in 2008, when the initial research misconduct allegations were brought to the attention of Northwestern's ORI by Levine and Oeser. The parties also agree that Mauvais-Jarvis did not file his complaint until three years later, in 2011. The parties dispute, however, which statute of limitations applies to this cause of action.

¶ 106    The defendants contend that the one-year statute of limitations for defamation claims found in section 13-201 of the Civil Procedure Code (735 ILCS 5/13-201 (West 2008)) is

applicable. That section provides in full:

> "Defamation–Privacy. Actions for slander, libel or for publication of matter violating the right of privacy, shall be commenced within one year next after the cause of action accrued." 735 ILCS 5/13-201 (West 2008).

¶ 107    Mauvais-Jarvis, on the other hand, argues that since the Civil Procedure Code does not contain a distinct statute of limitations provision for civil conspiracy claims, such claims should necessarily fall under the five-year "catch-all" limitations period provided for in section 13-205 of the Code (735 ILCS 5/13-205 (West 2008)). That section provides in full:

> "Five year limitation. *** [A]ctions on unwritten contracts, expressed or implied, or on awards of arbitration, or to recover damages for an injury done to property, real or personal, or to recover the possession of personal property or damages for the detention or conversion thereof, *and all civil actions not otherwise provided for*, shall be commenced within 5 years next after the cause of action accrued." (Emphasis added.) 735 ILCS 5/13-205 (West 2008).

¶ 108    For the reasons that follow, we disagree with Mauvais-Jarvis and find that his civil conspiracy claim against Wong, Oeser and Levine was properly dismissed as time-barred pursuant to section 13-201 of the Civil Procedure Code (735 ILCS 5/13-201 (West 2008)).

¶ 109    It is well settled that conspiracy, standing alone, is not a separate and distinct tort in Illinois. See *Weber v. Cueto*, 253 Ill. App. 3d 509, 518 (1993) (citing *Olsen v. Karwoski*, 68 Ill. App. 3d 1031, 1037 (1979)); *Thomas v. Fuerst*, 345 Ill. App. 3d 929, 936 (2004) ("Conspiracy is not an independent tort."); see also *Illinois Traffic Court Driver Improvement Education Foundation v. Peoria Journal Star, Inc.*, 144 Ill. App. 3d 555, 562 (1986) ("[T]he mere allegation of a conspiracy does not in and of itself constitute an allegation of wrongful acts upon which liability may be predicated. Rather, it is the act performed in pursuance of the agreement that may create liability."); see also *Adcock v. Brakegate, Ltd.*, 164 Ill. 2d 54, 63 (1994) ("An agreement to commit a wrongful act is not a tort, even if it might be a crime. [Citation.] A cause of action for civil conspiracy exists only if one of the parties to the agreement commits some act in furtherance of the agreement, which is itself a tort.").

¶ 110    Because it is the underlying tortious acts performed pursuant to the agreement that give rise to a claim for civil conspiracy, it is logical that a conspiracy claim itself be governed by the statute of limitations for the underlying tort. See 15 C.J.S. *Conspiracy* § 26, at 1043 (2013) (Unless a jurisdiction provides an independent statute of limitations for civil conspiracy, "[t]he statute of limitations for a civil-conspiracy claim is determined by the nature of the underlying conduct on which the claim of conspiracy is based. *** A claim alleging civil conspiracy is thus time-barred if the substantive tort underlying it was time-barred."). Otherwise, a plaintiff could evade the applicable statute of limitations for the underlying tort by simply recasting his or her claim as a "conspiracy" to perform that tort.

¶ 111    What is more, the few Illinois decisions that have addressed the appropriate statute of limitations for a conspiracy to defame action have applied the one-year statute of limitations for defamation pursuant to section 13-201 of the Civil Procedure Code (735 ILCS 5/13-201 (West 2008)). See, *e.g.*, *Weber*, 253 Ill. App. 3d at 522 (upholding the dismissal of a civil

conspiracy claim where the one-year statute of limitations had expired on the underlying, allegedly defamatory statements); *Zielinski v. Schmalbeck*, 269 Ill. App. 3d 572, 581 (1995) (applying the one-year statute of limitations for defamation to both the plaintiff's defamation and civil conspiracy to defame counts).

¶ 112    In rejecting Mauvais-Jarvis' request to apply the five-year catch-all statute of limitations, we have reviewed *Wakat v. Harlib*, 253 F.2d 59 (7th Cir. 1958), and *Breitenberger v. Schmidt*, 38 Ill. App. 168 (1890), cited to by him, and find them inapposite.

¶ 113    *Wakat* involved a cause of action brought pursuant to the federal Civil Rights Act, and not a state law conspiracy claim. The court in *Wakat* held that because the civil rights action was based upon the federal Civil Rights Act, it was a statutory right of action and thus a "civil action not otherwise provided for" within the meaning of the five-year statute of limitations pursuant to section 13-205 of the Civil Procedure Code (735 ILCS 5/13-205 (West 2008)).

¶ 114    Unlike *Wakat*, the present case does not involve a statutory right, but rather a common law conspiracy claim. While there is no question that the rights and liabilities of the parties to a federal civil rights action derive solely from the statute that creates it, the rights and liabilities of the parties to a civil conspiracy action, do not derive either from a statute or from a stand-alone common law tort. Rather, an action for conspiracy is derivative of the underlying tort. See *Employers Insurance of Wausau v. Ehlco Liquidating Trust*, 309 Ill. App. 3d 730, 747-48 (1999) (refusing to apply the 5-year "catch-all" statute of limitations to an action for declaratory judgment by an insured's liquidating trust regarding the duty to defend under an insurance contract, and instead applying the 10-year limitations statute for actions on written contracts; distinguishing *Wakat* on the basis that the parties' rights and liabilities did not derive from the statute creating the declaratory judgment action, but rather from the contract which created them).

¶ 115    We similarly find Mauvais-Jarvis' reliance on *Breitenberger* misplaced. That decision was published in 1890 and therefore carries no precedential weight. See, *e.g.*, *Reichert v. Court of Claims*, 203 Ill. 2d 257, 262 n.1 (2003) (noting that "appellate court decisions issued prior to 1935 are persuasive authority only"); *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 95 (1996) (noting that "[a]ppellate court decisions issued prior to 1935 ha[ve] no binding authority"). Furthermore, contrary to Mauvais-Jarvis' contention that case does not stand for the proposition that a conspiracy to defame claim is governed by the "catch-all" five-year statute of limitations. Rather, *Breitenberger* involved a conspiracy to deprive the plaintiff of his interest in a partnership and the related claim of action to trespass. See *Breitenberger*, 38 Ill. App. at 175-76. The court therein held that conspiracy as a cause of action was not included in the statute limiting time for suit to two years, but "*might* be held to be within the clause 'and all civil actions not otherwise provided for,' in the section which fixes the limitation at five years." (Emphasis added.) *Breitenberger*, 38 Ill. App. at 177. Considering the court's use of the conditional language in applying the five-year statute of limitations, we find this case unpersuasive.

¶ 116    For all of the aforementioned reasons, we conclude that the circuit court properly applied the one-year statute of limitations in section 13-201 of the Civil Procedure Code (735 ILCS

5/13-201 (West 2008)) to Mauvais-Jarvis' civil conspiracy claims against Wong, Oeser and Levine.

¶ 117                                    III. CONCLUSION

¶ 118    Accordingly, we affirm that part of the circuit court's order dismissing, as time-barred, Mauvais-Jarvis' civil conspiracy claims. We, however, reverse that part of the circuit court's order dismissing Mauvais-Jarvis' defamation actions against Wong, Qualkenbush, Walsh and Northwestern and remand for further proceedings on those claims.

¶ 119    Affirmed in part and reversed in part; remanded for further proceedings.