# Illinois Official Reports

## Appellate Court

*Razavi v. School of the Art Institute of Chicago*, 2018 IL App (1st) 171409

| | |
|---|---|
| Appellate Court Caption | OMID SHARIAT RAZAVI, Plaintiff-Appellant, v. SCHOOL OF THE ART INSTITUTE OF CHICAGO, EVA WALKUSKI, and ARIEL ZEKELMAN, Defendants (Eva Walkuski and Ariel Zekelman, Defendants-Appellees). |
| District & No. | First District, Second Division<br>Docket No. 1-17-1409 |
| Filed | November 20, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 16-L-8406; the Hon. Moira Johnson, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Deidre Baumann, of Baumann & Shuldiner, of Chicago, for appellant.<br><br>Vincent M. Casieri, of Schueler, Dallavo & Casieri, of Chicago, for appellee Ariel Zekelman.<br><br>Paula M. Ketcham and Hannah R. Roberts, of Schiff Hardin LLP, and Rachel D. Johnson, both of Chicago, for other appellee. |

JUSTICE LAVIN delivered the judgment of the court, with opinion. Presiding Justice Mason and Justice Pucinski concurred in the judgment and opinion.


**OPINION**

¶ 1        Plaintiff Omid Shariat Razavi now files his second interlocutory appeal relating to his defamation action against defendants Eva Walkuski and Ariel Zekelman. Defendants filed separate motions to dismiss under section 2-619 of the Code of Civil Procedure (Code) (735 ILCS 5/2-619 (West 2016)), both of which the circuit court granted after finding an absolute privilege precluded the lawsuit from proceeding. Plaintiff now contests that judgment on appeal. For the reasons to follow, we affirm.


¶ 2                                   BACKGROUND

¶ 3        In fall 2011, plaintiff, then age 29, and also Walkuski, then age 19, and Zekelman were students at the School of the Art Institute of Chicago (SAIC), a private institution, and all three lived in the SAIC dormitory. Walkuski and Zekelman were friends, and at some point before December 2011, plaintiff and Walkuski were also friends. In early September 2013, Walkuski reported to the SAIC campus security director and the director of student outreach that plaintiff had sexually assaulted her in 2011 and had stalked her in 2012 and 2013. Specifically, she reported to SAIC that plaintiff "repeatedly engaged in harassing behavior by following her around campus, contacting her against her wishes, and staring at her for extended periods of time during" spring 2012 and fall 2013.

¶ 4        About a week after Walkuski told SAIC campus security and authorities about plaintiff's actions, on September 13, 2013, SAIC's campus security director escorted Walkuski to the Chicago Police Department where she filed an incident report pertaining to the sexual assault and stalking. Around the same time, Zekelman reported to campus security an incident in plaintiff's dormitory, where while sleeping in a separate bed, she awoke to find plaintiff on top of her and kissing her in spite of Zekelman's expressed wishes not to have any physical contact.

¶ 5        These reports prompted several conversations between plaintiff and Patrick Spence, associate dean of student affairs, along with the campus security director. Plaintiff did not deny the sexual contact with Walkuski but claimed it was consensual and sometimes initiated by Walkuski. He presented campus security with a photograph and text messages and also denied any harassment, claiming no contact with Walkuski since August 2012. As to Zekelman, plaintiff claimed he never engaged in any sexual contact with Zekelman, denying that she even slept in his dorm room. Campus security then investigated plaintiff, resulting in his interim suspension while the investigation proceeded. SAIC campus security informed Felice J. Dublon, SAIC's vice president and dean of student affairs (VP of Student Affairs), of the allegations against plaintiff. In turn, Dublon informed plaintiff via a letter, dated October 1, 2013, that the information indicated he may have violated several rules of conduct from the SAIC student handbook and that a "Student Conduct Board Meeting" would be held in response. She wrote, "[t]he purpose of this Meeting is to discuss what has occurred, to determine whether or not you are responsible for violating SAIC'S Rules of Conduct and if so,

to determine what sanctions, if any, will be imposed." She further stated that if plaintiff disagreed with the information in the letter and wished to provide additional information, he could do so prior to the meeting. He could also bring an "advisor" there or a person of his choosing to serve as an advocate or bystander witness to the proceedings.

¶ 6 That meeting took place before the Student Conduct Board (Board) on October 3, 2013, with Walkuski reconfirming reports of harassment and sexual assault by plaintiff. While Zekelman formally withdrew her complaint, the Board nonetheless considered her complaint in assessing Walkuski's. Prior to the meeting, Zekelman also had reconfirmed her report of plaintiff's inappropriate sexual conduct, and the Board found it both relevant and credible. At the meeting, "[t]he members of the Board carefully reviewed the information presented and found the information and answers provided by [Walkuski] to be credible. They also found that, in many respects, the information and answers provided by [plaintiff] were not credible."

¶ 7 Based on the Board's recommendation and in the exercise of her discretion, Dublon found plaintiff had committed multiple violations of the rules of conduct, including sexual assault as defined in the handbook; physical harm to any person or verbal threats, intimidation, or coercion to an SAIC community member or any other conduct threatening to the health, safety, or well-being of such person; discrimination, harassment, or retaliation as defined in the handbook; and failure to comply with SAIC officials' directions. Plaintiff was expelled as a result. Dublon notified plaintiff that he could appeal the decision, but the appeal would only proceed if there was new information not available at the time of the original student conduct meeting. Plaintiff did in fact appeal but cited no new evidence, and his appeal was therefore denied. The determination of the Board remained final, as did his expulsion from SAIC.

¶ 8 Some 10 months after plaintiff's formal expulsion, on July 17, 2014, a hearing was held before the Cook County domestic violence division of the circuit court, with testimony from both Walkuski and plaintiff. Walkuski testified that while she had previously been friends with plaintiff, around January 2012, she had decided against maintaining the friendship and told him multiple times in person that she no longer wanted to have contact with him. Between January and April 2012, and about twice a week, plaintiff would knock obsessively at her dorm room door. Sometimes he would stand silently near the door until she peered through the peephole only to see him staring at her. This prompted Walkuski to remain in her dorm room quietly so as to avoid any contact with plaintiff. Plaintiff's behavior apparently only stopped after he was expelled from the residence halls in April 2012 for hitting a teacher.

¶ 9 Undeterred, however, between December 2012 and February 2013, plaintiff appeared at Walkuski's workplace, pacing around the desk while staring at her even though she repeatedly told him to stay away. About once a week, plaintiff also approached Walkuski when she was studying and stared at her from across the room. In August 2013, plaintiff attended Walkuski's class staring at her. This all prompted Walkuski to contact the director of student outreach and head of security, leading to the above-stated student conduct hearing and sanctions against plaintiff. Because of plaintiff's stalking, Walkuski felt fear, anxiety, and stress and had an escort to all of her classes.

¶ 10 At the protective order hearing, plaintiff denied that Walkuski told him to have no contact with her and essentially denied the stalking incidents.

¶ 11 Following the hearing, the circuit court found Walkuski's testimony more credible than plaintiff's. The court determined that Walkuski had proven her case by a preponderance of the evidence, insofar as it was more probably true than not that the incidents Walkuski alleged in

her amended petition had occurred, and plaintiff harassed and followed her repeatedly causing her fear. The court therefore entered a plenary stalking, no-contact court order against plaintiff. The order, which remained in effect until July 15, 2016, prohibited plaintiff from stalking or contacting Walkuski or knowingly coming within or remaining within 100 feet of her residence, school, and place of employment. The protective order was extended from August 2, 2016, until August 2, 2018.

¶ 12    Several days after the hearing on the protective order, on July 22, 2014, plaintiff filed a defamation suit against SAIC, Walkuski, and Zekelman. He alleged Walkuski and Zekelman defamed him by falsely reporting to campus security and SAIC that he had committed criminal sexual assault, stalking, and other sexual misconduct. Walkuski and Zekelman filed separate motions to dismiss, arguing the reports to campus security were either absolutely privileged because they were made to "law enforcement" or fell under a qualified privilege. They argued these defenses were affirmative matters that shielded them from defamatory liability. The trial court denied their motions, and they thereafter filed an interlocutory appeal under Illinois Supreme Court Rule 308 (eff. Jan. 1, 2016), allowing for certified questions of law.

¶ 13    In *Razavi v. Walkuski*, 2016 IL App (1st) 151435 (*Razavi I*), this court was tasked with addressing the circuit court's certified question of whether the absolute privilege applied to a college student's reports of sexual violence made to campus security. Specifically, the certified question asked whether campus security should be considered law enforcement for purposes of the alleged victim's report of sexual violence on campus. On appeal, plaintiff acknowledged that absolute privilege would attach to any statements made to local law enforcement but contended that statements made to campus security should expose defendants to liability for defamation. This court disagreed, holding that an "absolute privilege extends to statements made by alleged campus crime victims to campus security." *Id.* ¶ 10. We reasoned that the underlying rationale for the privilege, including the goal of protecting individuals who report crimes and also the public policy aimed at preventing campus sexual assaults, warranted treating campus security as law enforcement. We likewise held that when reports of sexual violence are made to campus security, courts must presume that the statements are made for the purpose of instituting legal proceedings, notwithstanding a defamation plaintiff's claim that the statements were false, maliciously motivated, or made for an unrelated purpose. In addition, we noted that "generally once a privileged statement is made to law enforcement any subsequent restatements made in furtherance of an investigation fall under this privilege." *Id.* ¶ 8. Accordingly, we remanded the case for further consideration in light of our answer to the certified question.

¶ 14    Following remand, on October 7, 2016, plaintiff filed a first amended complaint, again asserting defamation claims against Walkuski, Zekelman, and SAIC, among other claims. Rather than focusing on campus security, he alleged that Walkuski falsely, or with reckless disregard for the truth, reported to agents and employees of SAIC that plaintiff had sexually assaulted her in 2011 and had subsequently contacted her against her wishes and stalked her in 2012 and 2013. Plaintiff alleged that Walkuski made these statements to SAIC authorities knowing that they would constitute rule violations leading to his expulsion. Regarding Zekelman, plaintiff alleged she falsely, or with reckless disregard for the truth, reported to agents and employees of SAIC that plaintiff battered or sexually assaulted her in March 2012. He alleged her false allegations were considered in relation to Walkuski's allegations and contributed to SAIC's decision to expel him.

- 4 -

¶ 15    Again, Walkuski and Zekelman filed motions to dismiss under section 2-619(a)(9) of the Code. They argued that an investigation is a continuum and that it would make little sense to apply different levels of privilege to the same statements made at different points in an investigation. They argued that since their initial reports to campus security were absolutely privileged, so too were their subsequent statements to SAIC officials during the investigation and resolution of their complaints. In addition, Walkuski argued the restatements to SAIC officials of her initial crime report were absolutely privileged because they "were made as part of communications required by law."

¶ 16    On May 3, 2017, the circuit court granted their motions and dismissed the relevant counts in plaintiff's first amended complaint based on absolute privilege. The case remained pending as to SAIC, and accordingly, the court made an Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016) finding that there was no just reason to delay enforcement or appeal of the order. Plaintiff then filed this interlocutory appeal, challenging the trial court's judgment.

¶ 17                          ANALYSIS

¶ 18    A motion to dismiss under section 2-619 admits the legal sufficiency of the complaint but asserts an affirmative defense or other matter that avoids or defeats the plaintiff's claim. *Busch v. Bates*, 323 Ill. App. 3d 823, 831-32 (2001); 735 ILCS 5/2-619(a)(9) (West 2016). While the motion admits well-pleaded facts, it does not admit conclusions of law and conclusory factual allegations unsupported by allegations of specific facts. *Better Government Ass'n v. Illinois High School Ass'n*, 2017 IL 121124, ¶ 21. A section 2-619 motion should be granted by the circuit court if, after construing the documents supporting the motion in the light most favorable to the opposing party, it finds no disputed issues of fact and concludes that the affirmative matter negates the cause of action completely. *Busch*, 323 Ill. App. 3d at 832. The existence of an absolute privilege is such an affirmative matter, which warrants the dismissal of a defamation action. *Id.*; *Krueger v. Lewis*, 342 Ill. App. 3d 467, 473 (2003) ("In a defamation action, the issue of privilege is an affirmative defense that may be raised and determined in a section 2-619 motion."). We review an order granting a section 2-619 motion to dismiss *de novo*. *Lawler v. University of Chicago Medical Center*, 2017 IL 120745, ¶ 11.

¶ 19    Plaintiff maintains that absolute privilege does not apply and therefore his amended complaint asserting defamation should be allowed to proceed. To establish defamation, plaintiff must show that defendant made a false statement about the plaintiff and published the statement to a third party, causing damage. *Anderson v. Beach*, 386 Ill. App. 3d 246, 249 (2008). A defamatory statement is one that harms a person's reputation by lowering him in the community's eyes or deterring the community from associating with him. *Mauvais-Jarvis v. Wong*, 2013 IL App (1st) 120070, ¶ 67. For example, statements that impute a person has committed a crime constitute defamation *per se*.[1] *Id.* ¶ 69.

¶ 20    As noted in our previous opinion, defamatory statements are not actionable if they are protected by an absolute or conditional privilege. *Anderson*, 386 Ill. App. 3d at 249. Where only a qualified privilege is granted, the person making the statment is immune from liability *unless* some element, such as malice, is present. *Mauvais-Jarvis*, 2013 IL App (1st) 120070,

---

[1]Here, plaintiff alleged both defamation *per quod*, requiring him to plead and prove actual damages, and defamation *per se*, which does not require proof of actual damages for recovery. See *Mauvais-Jarvis v. Wong*, 2013 IL App (1st) 120070, ¶ 68.

¶ 72. On the other hand, where absolute privilege is granted, no cause of action for defamation lies against the person making the statement, *even if* it is made with malice. *Id.* ¶ 71. In light of the complete immunity provided by an absolute privilege, the classification of absolutely privileged statements is necessarily narrow. *Krueger*, 342 Ill. App. 3d at 473. " 'A communication is absolutely privileged when its propagation is so much in the public interest that the publisher should speak fully and fearlessly.' " *Anderson*, 386 Ill. App. 3d at 249 (quoting *Weber v. Cueto*, 209 Ill. App. 3d 936, 942 (1991)). This is because, as a matter of public policy, the person making the defamatory statement should not be deterred from speaking by the threat of civil liability. *Weber*, 209 Ill. App. 3d at 942; see also *Defend v. Lascelles*, 149 Ill. App. 3d 630, 635 (1986) ("The law thus clearly allows for an absolute privilege where there exists a significant interest in protecting the type of speech involved."). In other words, the defense of absolute privilege rests on the idea that conduct, which otherwise would be actionable, must escape liability because the defendant is acting in furtherance of some socially important interest, like the investigation of an alleged crime, that is entitled to protection even at the expense of uncompensated harm to the plaintiff's reputation. *Morris v. Harvey Cycle & Camper, Inc.*, 392 Ill. App. 3d 399, 404 (2009); *Weber*, 209 Ill. App. 3d at 942. The privilege is based on a policy that regards the ends to be gained by permitting such statements as outweighing the harm which may be done to the reputation of others. *Weber*, 209 Ill. 2d at 942.

¶ 21 Indeed, according to the Restatement (Second) of Torts, absolute privilege recognizes that certain individuals, due to their special position or status,

> "should be as free as possible from fear that their actions in that position might have an adverse effect upon their own personal interests. To accomplish this, it is necessary for them to be protected not only from civil liability but also from the danger of even an unsuccessful civil action. To this end, it is necessary that the propriety of their conduct not be inquired into indirectly by either court or jury in civil proceedings brought against them for misconduct in their position. Therefore the privilege, or immunity, is absolute and the protection that it affords is complete." Restatement (Second) of Torts, ch. 25, topic 2, tit. B, intro. note, at 243 (1977).

¶ 22 The privilege embraces actions required or permitted by law in the course of judicial or quasi-judicial proceedings, as well as actions "necessarily preliminary" to judicial or quasi-judicial proceedings. *Layne v. Builders Plumbing Supply Co.*, 210 Ill. App. 3d 966, 969 (1991). In addition, section 592A of the Restatement (Second) of Torts says, "One who is required by law to publish defamatory matter is absolutely privileged to publish it." Restatement (Second) of Torts § 592A, at 257 (1977). According to the comment, "This Section rests upon the principle that one who is required by law to do an act does not incur any liability for doing it." Restatement (Second) of Torts § 592A cmt. b, at 257 (1977). As with a motion to dismiss, the question of whether a defamatory statement is protected by an absolute privilege is one of law for the court. *Layne*, 210 Ill. App. 3d at 969.

¶ 23 In this appeal, plaintiff concedes that statements, when first conveyed to law enforcement and then repeated during a criminal investigation, are protected by absolute privilege. See *id.* at 971 (statements to police pertaining to alleged criminal activities should be absolutely privileged). Plaintiff likewise acknowledges this court's previous holding, that the victims'

reports of sexual assault and misconduct to campus security[2] were absolutely privileged since campus security is akin to law enforcement. Plaintiff, however, now challenges the trial court's ruling that these same statements, when repeated to SAIC agents and authorities both before and during the student conduct review process, were absolutely privileged. Plaintiff asserts that process was not a " 'continuum' of any criminal investigation," nor was his disciplinary hearing "quasi-judicial" in nature such that absolute privilege applied.

¶ 24     Walkuski and Zekelman have filed separate appellate briefs in response while jointly challenging plaintiff's contentions. They assert that the absolute privilege afforded to their initial crime reports to campus security continued to apply in the context of the investigation and disciplinary hearing that flowed from the reports. In particular, Walkuski argues that the repeated allegations were made as part of communications required by law. With this, we wholeheartedly agree.

¶ 25     In this case, the 2013-14 SAIC Student Handbook's policy on sexual assault, relationship violence, and stalking was explicitly adopted in accordance with the Violence Against Women Reauthorization Act of 2013 (colloquially referred to as the Campus SaVE Act) (Pub. L. 113-4, § 304, 127 Stat. 54, 89 (eff. Mar. 7, 2013) (amending 20 U.S.C. § 1092(f))), which was passed to encourage greater transparency, enhance the victims' information and rights, and add requirements for educational institutions to address and prevent sexual violence on campus.[3] Evelin M. Clay, *Colleges and Universities: A Place to Get Away With Rape*, 28 St. Thomas L. Rev. 256, 265 (2016). It is enforced by the United States Department of Education and applies to all colleges and universities that receive federal funding, including student financial assistance. See U.S. Dep't of Educ., The Handbook for Campus Safety and Security Reporting (2016), https://www2.ed.gov/admins/lead/safety/handbook.pdf [https://perma.cc/Y5H3-CUQ5]. Specifically, each eligible institution is required to distribute to both students and employees the campus security policies and crime statistics, including the reporting procedures and the institution's response to such reports, as well as statistics on sex offenses, domestic violence, dating violence, and stalking incidents reported to campus security. 20 U.S.C. § 1092(f)(1)(A)-(C), (J) (Supp. II 2014). The school must timely report sex offenses, and the like, to the campus community when the offenses are "considered to be a threat to other

---

[2]Although not entirely clear, Plaintiff appears to argue that Zekelman first reported plaintiff's misconduct to SAIC authorities, including Dublon. This is contrary to the facts set forth in *Razavi I*, 2016 IL App (1st) 151435, ¶ 4. It is also contrary to plaintiff's initial complaint, wherein he alleged Zekelman falsely reported the misconduct to "campus security." In addition, Dublon's October 1, 2013, letter addressed to plaintiff, indicates Zekelman reported his sexual misconduct to campus security. We therefore reject plaintiff's claim.

[3]As we noted in *Razavi I*, 2016 IL (1st) 1511435, ¶ 14 n.2, effective in 2015, the Illinois legislature enacted the Preventing Sexual Violence in Higher Education Act (Act) (110 ILCS 155/1 *et seq.* (West 2016)). The Act requires higher education institutions, including those that are for-profit like SAIC, to have a comprehensive policy to "address student allegations of sexual violence, domestic violence, dating violence, and stalking," consistent with federal and state law. 110 ILCS 155/5 (West 2016). The Act requires the comprehensive policy to identify procedures for reporting sexual violence, the institution's procedure for responding to a report of an alleged incident of sexual violence or misconduct, the complaint procedures, and possible sanctions that might be imposed, including expulsion. See 110 ILCS 155/10 (West 2016). This law is inapplicable to the present case, insofar as the policy in place and incidents occurred prior to the enactment of the Act.

students and employees," so as to prevent "similar occurrences." 20 U.S.C. § 1092(f)(3) (Supp. II 2014).

¶ 26 Each school is required to develop and distribute a policy on "programs to prevent domestic violence, dating violence, sexual assault, and stalking," and also develop and distribute procedures to follow if any incidents are reported. 20 U.S.C. § 1092(f)(8)(A) (Supp. II 2014). A school's policy must identify procedures for victims to follow if an offense occurs, with information on the importance of preserving evidence, while giving the victims' options for reporting the matter to law enforcement (including campus and local police) and campus authorities. 20 U.S.C. § 1092(f)(8)(B) (Supp. II 2014). The policy, for example, might inform victims about protective orders or similar lawful orders. 20 U.S.C. § 1092(f)(8)(B) (Supp. II 2014). The policy must identify "[p]ossible sanctions or protective measures" the school can impose after a final decision in a disciplinary procedure for "rape, acquaintance rape, domestic violence, dating violence, sexual assault, or stalking," including a statement regarding the standard of evidence used in the proceeding arising from the victim's report. 20 U.S.C. § 1092(f)(8)(A), (B) (Supp. II 2014). The disciplinary procedures for the above-stated offenses must "*provide a prompt, fair, and impartial investigation and resolution*." (Emphasis added.) 20 U.S.C. § 1092(f)(8)(B)(iv)(I)(aa) (Supp. II 2014); see also 34 C.F.R. § 668.46 (2016). The complainant and the accused "are entitled to the same opportunities to have others present during an institutional disciplinary proceeding, including the opportunity to be accompanied *** by an advisor of their choice." 20 U.S.C. § 1092(f)(8)(B)(iv)(II) (Supp. II 2014). Both must also be informed about the outcome of the disciplinary proceeding and any appeal rights. 20 U.S.C. § 1092(f)(8)(B)(iv)(III) (Supp. II 2014).

¶ 27 Here, in accordance with the Campus SaVE Act, the SAIC policy encourages anyone subjected to sexual assault, relationship violence, or stalking to report the incident promptly to the police and/or SAIC officials. In particular, the policy encourages victims to report those incidents to campus security or the director of student outreach in the Office of Student Affairs and also seek immediate medical attention, among other things. The policy lists a number of resources for victims, identifies applicable state laws, and delineates what to do if a protective order is necessary. The victim has a right to file a complaint with campus security or the Office of Student Affairs. The policy states, "If the alleged offender is also a member of the SAIC community, SAIC will take prompt action to investigate and, where appropriate, to impose sanctions." An SAIC investigation is to take place especially if SAIC decides the safety of the community is at risk. If the alleged offender is a student, then the VP of Student Affairs or a designee is responsible for investigating and resolving the complaint. In addition, the policy provides that any student offenders are subject to the "Student Conduct Procedures."

¶ 28 Mirroring the language in the Campus SaVE Act, SAIC's policy states that these student conduct procedures provide a "*prompt, fair, and impartial investigation and resolution of the alleged misconduct*." (Emphasis added.) See 20 U.S.C. § 1092(f)(8)(B)(iv)(I)(aa) (Supp. II 2014). In particular, the VP of Student Affairs and/or campus security may interview anyone, including the victim and the accused, and the interviewees must provide truthful information or otherwise potentially face violating the rules of conduct. The accused must receive both notification of the rules allegedly violated and notice of the student conduct meeting. A student conduct meeting, although not a courtroom procedure allowing for formal rules of evidence, permits the accused an opportunity to respond to the complaint and allows for review of the student's acts of misconduct and any prior acts. While the VP of Student Affairs controls who

to admit to the meeting and also what information is presented, both the complainant and the accused are responsible for presenting their own case, and both can bring one "advisor" with them, or an individual of their choosing to simply consult with before, during, or after the hearing. Whether an accused is responsible for violating rules is based on "whether it is more likely than not that the student accused of misconduct violated the Rules of Conduct or other SAIC policies, rules, or regulations." See also 20 U.S.C. § 1092(f)(8)(A), (B) (Supp. II 2014) (requiring a statement regarding the standard of evidence). Following closed-door deliberations by the Board members, they can recommend possible sanctions, including expulsion, and the VP of Student Affairs will have the final say on the case's disposition.

¶ 29    Given SAIC's policy, which was implemented as required by federal law, and Illinois precedent, as well as the Restatement (Second) of Torts, we conclude that the victims' allegedly defamatory restatements to SAIC authorities and agents about the claimed sexual assault and misconduct were absolutely privileged. We find several cases dispositive. In *Weber*, 209 Ill. App. 3d 936, attorney Amiel Cueto wrote a letter to the chief circuit court judge for Madison County regarding State's Attorney Donald Weber and his employee, Virginia. Cueto asserted on hearsay that Weber, and by implication, Virginia, had committed numerous acts of misconduct, including the improper use of funds. Cueto noted it was his duty under the rules of professional conduct to report the misconduct to a tribunal, including the chief judge, the Madison County Board, and the Attorney Registration and Disciplinary Commission (ARDC). Following these publications, Virginia filed a defamation suit against Cueto, who affirmatively claimed that his statements were absolutely privileged as required by his ethical obligations as an attorney. The trial court granted Cueto's motion to dismiss as to all three "tribunals," and the only issue on appeal was whether the trial court was correct in determining absolute privilege attached to the county board because it was a quasi-judicial body.

¶ 30    In *Weber*, this court noted section 592A of the Restatement (Second) of Tort's requirement that " '[o]ne who is required by law to publish defamatory matter is absolutely privileged to publish it.' " *Id.* at 942 (quoting Restatement (Second) of Torts § 592A, at 257 (1977)). This court also noted the mandatory reporting requirement under the rules of professional conduct was in the public interest, as it was designed to protect individuals and the public at large from lawyer misconduct and maintain public confidence in the integrity of the legal profession. *Weber* further acknowledged that the county board was empowered to investigate the improprieties Cueto had alleged consistent with the rules of professional conduct. This court, accordingly, held that Cueto's communications to the county board under the disciplinary rule were "cloaked with an absolute privilege" and upheld the dismissal of the Virginia's defamation suit. *Id.* at 947. *Weber* noted that, having found Cueto required by law to publish the defamatory matter, there was no reason to also consider whether the county board was a quasi-judicial body.

¶ 31    Similarly, in *Busch*, 323 Ill. App. 3d at 833-34, an absolute privilege applied to several police officers against a crime scene technician, where the officers alleged the technician threatened a suspect in a homicide investigation and committed other misconduct to disrupt investigations. This court found the statements were made during an internal police disciplinary investigation and the officers were legally obligated to report such behavior pursuant to a state police directive.

¶ 32    In *Belluomini v. Zaryczny*, 2014 IL App (1st) 122664, ¶ 26, an apparently concerned citizen reported by letter to the Chicago police superintendent that a number of police officers

committed misconduct by working at the direction of an aldermanic candidate on election day, thus violating civil and voting rights. Plaintiffs (the accused police officers) sued the concerned citizen for defamation. This court upheld the trial court's dismissal of the defamation suit, after finding that the police department, headed by the superintendent, was a quasi-judicial body and, significant for the purposes of this appeal, that the statements were also made to law enforcement officials for the purpose of instituting criminal proceedings. The police officers argued that the concerned citizen's allegations were made to an administrative (as opposed to quasi-judicial) body of the police department and thus were not privileged, but this court held the statements were "clearly part of the ongoing investigation that was triggered" by the initial letter. *Id.* The *Belluomini* court held the investigation was itself a quasi-judicial proceeding and wrote, "An investigation is a continuum and it defies rational thinking to isolate certain portions of the investigation in order to apply different levels of privilege." *Id.*

¶ 33    We referenced the preceding sentence from *Belluomini* in our prior opinion when noting that "generally once a privileged statement is made to law enforcement any subsequent restatements made in furtherance of an investigation fall under this privilege," even if made to SAIC employees not employed within the campus security department. *Razavi I*, 2016 IL App (1st) 151435, ¶ 8. To the extent this principle of law was *dicta*, we now make it our holding, and reaffirm *Razavi I* for the following reasons.

¶ 34    We already explained the rationale for treating reports of sexual assault to campus security as absolutely privileged based on public policy. It would make little sense, then, to hold the initial report of the crime/misconduct to campus security absolutely privileged but not the repeated allegations made in furtherance of the investigation. In this case, while the investigation itself was not quasi-judicial, we find it's enough that it emerged out of a fully protected initial report. In congruity with *Belluomini*, the investigation by both campus security and SAIC officials constitutes a continuum requiring the same level of absolute privilege to be applied throughout the investigation and resolution of the complaint, including at the disciplinary proceeding.

¶ 35    Furthermore, the SAIC policy was developed and implemented pursuant to federal law and required that SAIC promptly and fairly investigate the allegations and, where appropriate, impose sanctions following a disciplinary hearing. Dublon, the VP of Student Affairs, confirmed this by attesting that "SAIC complies with federal education policy, which requires that colleges and universities respond to and address effectively allegations of harassment and sexual assault, whenever those allegations are made." Thus, SAIC was legally required to pursue the investigation. While the SAIC policy did not *require* Walkuski and Zekelman to file a complaint or comply with the investigation, once they did file their complaints and consistent with federal law, the policy provided for SAIC's protocol. *Cf. Mauvais-Jarvis*, 2013 IL App (1st) 120070, ¶¶ 72, 76-80 (finding only a qualified privilege applied to allegedly defamatory statements made in the context of a private university's research misconduct proceeding, where federal regulations and university policy required reporting on basis of "good faith," thus injecting one of the elements of qualified privilege into the proceeding itself and where duty to report was not mandatory). As in *Weber*, Walkuski and Zekelman's restatements made under these federally mandated procedures, by implication, should be cloaked with the same privilege as if the restatements themselves were legally required. To hold otherwise would render SAIC's required investigatory and disciplinary procedures and policies toothless, for

- 10 -

absent the victim's evidence, there would be no basis to proceed. Therefore, in summary, we hold that repeated allegations about a claimed sexual assault or misconduct made to campus security and school authorities, and which are published as part of an investigation into and disciplinary hearing for the alleged misbehavior, are cloaked with absolute privilege.

¶ 36    Public policy demands this result. It is beyond a doubt that the victims' participation in these proceedings is in the public interest. See William L. Prosser, Handbook of the Law of Torts § 114, at 777 (4th ed. 1971) ("Absolute immunity has been confined to a very few situations where there is an obvious policy in favor of permitting complete freedom of expression, without any inquiry as to the defendant's motives."). Absolute privilege in this context encourages victims to report crimes and misconduct promptly without fear of explicating the facts and circumstances surrounding any attack as the investigation unfolds. *Cf.* 735 ILCS 5/8-804 (West 2016) ("Because of the fear, stigma, and trauma that often result from incidents of sexual violence, many survivors hesitate to report or seek help, even when it is available at no cost to them."). If sexual assault victims are at risk of facing a civil lawsuit from their attacker throughout the reporting and disciplinary process, they will be less likely to come forward and report the crime. Absent a report, the sexual assault perpetrator goes free, potentially committing other similar misdeeds. This places the entire campus unnecessarily at a safety risk, thus dampening the intended purpose of higher education in a safe environment. The absence of a victim's unfettered report not only interferes with the school's duty to investigate and risks violating federal law, but it also potentially exposes the university to tort liability and other financial risks for any future sexual assaults by the same perpetrator. See, *e.g.*, *Nero v. Kansas State University*, 861 P.2d 768, 780 (Kan. 1993) (where plaintiff, a Kansas State University (KSU) student, was allegedly raped in a coed dorm by a KSU student who had previously raped another student, supreme court reversed summary judgment for defendant university after finding university had a duty of reasonable care to protect students against certain dangers that are reasonably foreseeable and within the university's control); *Miller v. State*, 467 N.E.2d 493 (N.Y. 1984) (a victim who was raped in her college dorm could sue college for negligence based on special relationship after college had notice of likely criminal intrusions, yet failed to lock outer doors of dorm); *Mullins v. Pine Manor College*, 449 N.E.2d 331 (Mass. 1983) (upholding negligence jury verdict against college by victim for her rape on campus based on voluntary undertaking).

¶ 37    And, although plaintiff maintains that there are no repercussions for false reports in this instance, we disagree since the student handbook sets forth that the complainant, like the accused, must provide truthful information or otherwise potentially face violating the rules of conduct. As such, a complainant who falsely reports a sexual assault can also be subject to expulsion. See *Hartman v. Keri*, 883 N.E.2d 774, 778 (Ind. 2008) (noting that, where a student is subject to academic discipline for abuse of the process, that serves as a substantial deterrent to false reporting). Likewise, it would be against public policy to force a victim of sexual assault to parse out what statements would or would not make her subject to a potential defamation lawsuit as she complies with the very policies and procedures of the institution to ensure a proper educational environment. See *id.* at 777-78 ("as long as the process is reasonably transparent and fair and affords the subject an opportunity to respond, we think the ultimate issue focuses less on the particular process and more on the recognition of the institution's interest in assuring a proper educational environment"). Thus, the ends to be

gained by granting absolute privilege far outweigh the harm that may be done to the alleged perpetrator's reputation. *Weber*, 209 Ill. App. 3d at 942.

¶ 38    Our holding is also consistent with our previous ruling in *Razavi I*. As stated, we also determined a presumption exists that statements alleging sexual assault or misconduct made to campus security were made *for the purpose of instituting legal proceedings*, notwithstanding a defamation plaintiff's claim that the statements were false, maliciously motivated, or made for a purpose unrelated to the institution of legal proceedings. *Razavi I*, 2016 IL App (1st) 151435, ¶ 11. The same presumption should apply to restatements made during an investigation into and hearing on sexual assault or misconduct. This is especially true where such an investigation is aimed at culling information that could in turn determine whether a criminal charge should be brought or whether civil proceedings, like a tort or application for a protective order, should be instituted. Plaintiff seems to argue that there's no *indicia* of reliability to a victim's report unless a criminal proceeding follows. Notwithstanding that it is the state's attorney who decides whether to file charges in any particular case (*id.* ¶ 15), that position is untenable when one considers the policy behind section 587 of the Restatement (Second) of Torts. That section by analogy provides that a party to private litigation or defendant in a criminal prosecution "is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding, or in the institution of or during the course and as a part of, a judicial proceeding in which he participates, if the matter has some relation to the proceeding." Restatement (Second) of Torts § 587, at 248 (1977). Comment b to section 587 explains that the rule "applies to communications made by a client to his attorney with respect to proposed litigation as well as to information given and informal complaints made to a prosecuting attorney or other proper officer preliminary to a proposed criminal prosecution whether or not the information is followed by a formal complaint or affidavit." Restatement (Second) of Torts § 587 cmt. b, at 249 (1977).

¶ 39    Adopting that rationale, we conclude that it is immaterial whether a formal criminal complaint or civil legal proceeding actually followed the victims' reports of plaintiff's sexual assault/misconduct. Likewise, it matters not whether a formal school disciplinary hearing flowed on the heels of the report. Nevertheless, the evidence in this case supports the above-stated presumption, where Walkuski filed an incident report with the police, then participated in the disciplinary proceedings against plaintiff, and also appeared before the Cook County circuit court where she testified in support of a protective order. Like the SAIC Board, the court found her testimony more credible than plaintiff's insofar as it was more likely true than not that the incidents Walkuski alleged in her amended petition regarding plaintiff's creepy behavior had occurred and plaintiff harassed and stalked her repeatedly. The court accordingly granted her the protective order, which she had extended up until just several months ago. As such, contrary to plaintiff's view, the evidence undeniably shows the legal proceedings emanated from Walkuski's initial allegations to campus security and the ensuing investigation and hearing.

¶ 40    In finding absolute privilege, as in *Weber*, we find it unnecessary to address whether the disciplinary hearing was quasi-judicial in nature, even though plaintiff vigorously pursues this line of argument in his appeal. We note that SAIC's rules permit that disciplinary hearings may be taped or recorded, but there is no evidence of that occurring in this case. In addition, plaintiff has failed to provide this court with a report of proceedings on Walkuski and

Zekelman's motions to dismiss presented to the trial court, although he quotes that oral argument at some length. Where, as here, an appellant fails to ensure the record on appeal contains a report of proceedings and his argument fails to cite to the record appropriately, he violates our supreme court rules, which have the force and effect of the law and are binding on litigants. See Ill. S. Ct. R. 323 (eff. July 1, 2017); R. 341(h)(7) (eff. Nov. 1, 2017) (the argument section must contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on); *In re Marriage of Thomsen*, 371 Ill. App. 3d 236, 241 (2007). Finally, we note that to the extent plaintiff relies on attachments to his brief, we cannot consider them. See *Walczak v. Onyx Acceptance Corp.*, 365 Ill. App. 3d 664, 672 (2006) (documents the appellate court may consider must be included in record, and not simply in appendix).

¶ 41      Along the same lines, while plaintiff insists the trial court incorrectly found the SAIC student disciplinary hearing to be quasi-judicial, the trial court's order simply reflects its determination that Walkuski and Zekelman's statements were absolutely privileged absent identifying any rationale. However, as this opinion reveals, a reviewing court may affirm a correct decision for any reason appearing in the record, regardless of the basis relied upon by the trial court. See *Weber*, 209 Ill. App. 3d at 947.

¶ 42                          CONCLUSION

¶ 43      For the reasons set forth above, we affirm the trial court's dismissal of plaintiff's defamation claims against both Walkuski and Zekelman.

¶ 44      Affirmed.